MARY RUTH BRANNON, Indiv. and as Adm'x of the Estate of Willis Brannon, Jr., Deceased, Plaintiff-Appellant and Appellee, *v.* SOUTHERN ILLINOIS HOSPITAL CORPORATION *et al.*, Defendants-Appellants and Appellees.

Fifth District    No. 74-349

Opinion filed December 14, 1978.—Rehearing denied March 14, 1979.

Callis, Schooley, Filcoff & Hartman, of Granite City (William W. Schooley, of counsel), for appellant-appellee Mary Ruth Brannon.

Irvin C. Slate, Jr., of Granite City, and Thomas M. Carney, of Husch, Eppenberger, Donohue, Elson & Cornfeld, of St. Louis, Missouri, for appellant McDonald-Inter American Corporation.

Dunham, Boman, Leskera & Churchill, of Belleville (Russell K. Scott, of counsel), for appellants Minner Construction Company, Inc., and McDonald-Inter American Corporation.

John C. Shepherd and Peter Von Gontard, both of Coburn, Croft, Shepherd, Herzog & Putzell, of St. Louis, Missouri, for appellant Southern Illinois Hospital Corporation.

Harold A. Donovan and Dennis E. Rose, both of Brady, Donovan & Hatch, of Belleville, for appellant Cedar Elevators and Equipment, Inc.

Burroughs, Simpson, Wilson, Hepler & Broom, of Edwardsville, for appellee Energy Elevator Company, Inc.

Wagner, Bertrand, Bauman & Schmieder, of Belleville (Bernard H. Bertrand, of counsel), for appellee Calandrino and Associates.

Mr. JUSTICE FRIEDMAN delivered the opinion of the court:

A wrongful death action.

Plaintiff's decedent was killed while cleaning a drain at the bottom of a dumbwaiter shaft at Doctor's Memorial Hospital, Carbondale, Illinois, on January 3, 1972.

Defendants, Southern Illinois Hospital Corporation and Calandrino and Associates, were sued in negligence. Minner Construction Company, Inc., and McDonald-Inter American Corporation, a joint venture, Cedar Elevators and Equipment, Inc., and Energy Elevator Company, Inc., were sued in strict liability.

Verdicts were returned in favor of plaintiff and against Southern Illinois Hospital Corporation, Cedar, and the joint venture, with damages in the amount of $300,000. Verdicts were returned against plaintiff and in

favor of Energy and Calandrino. Southern Illinois Hospital Corporation, Cedar, and the joint venture, appeal against plaintiff. Plaintiff cross-appeals against Energy and Calandrino. McDonald-Inter American appeals, claiming that it was not properly joined as a party.

## The Facts

Doctor's Memorial Hospital engaged Calandrino to act as architect for an addition to its hospital facilities in Carbondale. Calandrino prepared plans and specifications. The joint venture successfully bid for the general work. The joint venture subcontracted with Cedar to furnish and install elevators and dumbwaiters. Their agreement specified that the dumbwaiter at issue here would be manufactured by Energy Elevator Company. The general contract provided that the dumbwaiter could be one made by Otis Elevator Company, Energy Elevator Company, Montgomery Elevator Company, or an approved equal. The subcontract was approved by the architect.

Energy manufactured the dumbwaiter and shipped it to the hospital in five crates and several bundles. The dumbwaiter was spray painted with grey paint when shipped. The dumbwaiter was assembled and installed by Cedar. The joint venture performed no work in this regard, but only erected the shaftway.

The dumbwaiter has a power train in the bottom, an access door in the shaftway at the first-floor level for servicing or cleaning, and a car with biparting gates which open up and down. At the lower front of the unit, guide rails are separated by a metal spreader bar. The purpose of the spreader bar is to keep the guide rails in alignment during manufacture, shipment, and installation. There was evidence that the spreader bar was secured to the rails by a temporary weld and that it was to be removed after installation of the dumbwaiter. Cedar presented evidence tending to prove that the spreader bar is welded permanently and is not to be removed.

There was evidence that an employee of Energy printed the word "remove" on the spreader bar prior to shipment. At some time later, the word was covered by painting. After the accident, the paint was removed, revealing the word "remove." There was further evidence that Energy did no brush painting at its plant, and did only spray painting. The dumbwaiter spreader bar, at some point, had been brush painted. The masonry surrounding the dumbwaiter also contained streaks of paint, apparently from splashing. The employees of Cedar denied having painted the dumbwaiter. Witness Sprawl said that he had seen Cedar workers painting metal braces.

Hines, a professional safety officer, testified as an expert witness for plaintiff. In his opinion, the dumbwaiter, as installed, was in an

unreasonably dangerous condition because it lacked an access door contact switch, the disconnect switch was too far away from the machine, because the spreader bar was still on the machine, and because there was no warning on the access door of movable machinery in the access area. Other evidence indicates that the dumbwaiter could be deactivated either by opening the biparting gates of the car, or by a disconnect switch located some distance away.

There was testimony that job safety was first and foremost in decedent's mind.

During construction, sand, dirt, concrete, and pieces of debris fell into the drain at the bottom of the hoistway and clogged it up. Plaintiff's decedent, Willis Brannon, a plumber, and his superintendent, Charles Patrick, arrived at the hospital at 8 or 8:30 a.m. on January 3, 1972, to correct several items, including the clogged drain.

When Brannon first arrived at the hospital, he met with Mr. Holder, assistant superintendent of maintenance of the hospital. Brannon first fixed a fresh air intake valve and then worked on a steam trap in the boiler room. Brannon left to obtain a vacuum cleaner from Jack Gunn, the maintenance superintendent, to clean the drain. Gunn told him where he could find one. Gunn observed Brannon proceed in the direction of the dumbwaiter.

Reeta Grammer, a nurse, testified that Brannon told her he had come to clean out the drain. She saw him in and out of the area around the dumbwaiter several times. While he was working, the dumbwaiter had been in use. She also testified that if someone saw that the dumbwaiter doors were open, they would just automatically close them. She had closed the doors several times that morning.

Helen Huffman, a nurse, was employed on the third floor of the hospital. She had occasion to use the dumbwaiter that morning. She had no knowledge that there was a person working on the dumbwaiter, and there was no sign indicating that the dumbwaiter should not be used. At about 9 a.m., she pushed the dumbwaiter button at the third floor level. She heard a muffled cry for help that seemed to be coming from the shaft of the dumbwaiter. She went to the first floor and found Brannon. His head and back were up in the shaft.

Dr. John Taylor testified that a spreader bar was underneath Brannon's neck and left arm and squeezed him against the top of the access tile. Brannon was pronounced dead.

## Strict Tort Liability of Installers

■■ Cedar contends that strict liability cannot be applied against it because it supplied only a service and not a product. It cites as the general rule that one who supplies only a service is not subject to the rule of strict

product liability. (See *Stewart Warner Corp. v. Burns International Security Services, Inc.* (N. D. Ill. 1972), 343 F. Supp. 953.) However, the evidence at trial amply supports the conclusion that Cedar was to supply and install a dumbwaiter. We affirm the verdict as to Cedar.

■ The installer of a product can be held strictly liable for a defect in the product. In *Court v. Grzelinski* (1978), 72 Ill. 2d 141, 379 N.E.2d 281, the supreme court held that a complaint stated a good cause of action in strict liability against a used-car dealer who defectively assembled, installed, and positioned a gas tank. *Court v. Grzelinski* distinguishes *Peterson v. Lou Bachrodt Chevrolet Co.* (1975), 61 Ill. 2d 17, 329 N.E.2d 785, but the latter case is instructive because it explicates the theory of strict liability. Underlying the theory is the notion that losses should be borne by those who have created the risk and reaped the profit by placing the product in the stream of commerce. Liability is imposed upon anyone who is engaged in the business of selling the product, but by means of indemnification the loss will ordinarily be ultimately borne by the party that created the risk.

In *O'Laughlin v. Minnesota Natural Gas Co.* (Minn. 1977), 253 N.W.2d 826, the trial judge refused plaintiff's tendered instructions on strict liability and permitted only the negligence theory to go to the jury. Defendant Ries was a subcontractor hired to install a new furnace system in plaintiff's home. Plaintiff was injured when she fell on a grate installed by Ries. The supreme court held that strict liability applied to a defective installation and plaintiff need only show (1) that the product purchased was in a defective condition unreasonably dangerous for its use, (2) that such defective condition existed when the product left the hands of defendant, and (3) that the defect was the proximate cause of the injury.

An Illinois case, *Woodrick v. Smith Gas Service, Inc.* (1967), 87 Ill. App. 2d 88, 230 N.E.2d 508, reaches the same result. The case was submitted on negligence and strict liability. Plaintiff was operating her auto equipped with a device known as "auto-start," which had been installed by defendant. The purpose of the device was to start and stop the car to maintain engine temperature during periods when the car was unattended. The device consisted of a bead chain connecting a solenoid to the throttle lever. Subsequent to the installation, defendant had modified the device because plaintiff's husband had experienced a locking of the accelerator. On the day of plaintiff's accident, she passed a truck and let up on the accelerator. The car did not slow down, but accelerated to 100 m.p.h. She eventually hit a light pole. The appellate court affirmed the jury verdict on the strict liability theory.

*Barth v. B. F. Goodrich Tire Co.* (1968), 265 Cal. App. 2d 228, 71 Cal. Rptr. 306, was an action against the manufacturer and the supplier and installer of a defective tire. The supplier and installer, Perry & Whitelaw,

Inc., was sued in strict liability. They had supplied and installed Goodrich tires on Barth's company-owned stationwagon pursuant to a fleet service agreement between Goodrich and Barth's employer. They received from Goodrich a $4.13 installation fee and credit for the tires supplied. Perry & Whitelaw tendered an instruction which would have required the jury to find that it was a seller and that it had sold a tire to plaintiff's employer. A sale was defined as a transfer or agreement to transfer for a price. The court found that there was no error in rejecting the instruction because the definition of a seller did not comport with section 402A of the Restatement (Second) of the Law of Torts (1965). A jury need find only that the defendant was an integral part of the overall producing and marketing enterprise.

■ We must reverse the verdict as to the joint venture. The joint venture contracted to provide a dumbwaiter. It subcontracted its obligation to Cedar, and the architect approved the subcontract. The evidence is that the joint venture performed no work on the dumbwaiter itself. It is clear that this defendant was not responsible for any designing, manufacturing, marketing, or installation. Its connection to the case was a matter of form, only.

### Strict Liability—Assumption of the Risk or Misuse of the Product

Cedar contends that the decedent had worked in and around the dumbwaiter. He supervised other persons and advised them of the danger in not shutting the system down while working around it. He was aware that the dumbwaiter could be deactivated by opening the bifurcated doors. Thus, decedent is said to have clearly recognized and understood the danger.

Recovery in a strict liability case will be barred if a defendant pleads and proves that the injured party knew the product was in a dangerous condition and proceeded to use the product in disregard of the known danger. *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305; *Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.

In *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 382, decedent was working on the railroad. He was directing a loading operation. A crane in use had two booms. One boom held a "clam shell" bucket suspended at the top of the boom; this boom was not in use and was secured by two devices. The other boom was used to lift materials. Decedent was standing beneath the booms when he was struck and killed by the bucket. Plaintiff sued the manufacturer of the crane in strict liability. The supreme court said of assumption of the risk:

"The acts asserted are Reese's conduct in standing beneath the

suspended bucket and directing the commencement of hoisting operations while the clam shell bucket was still suspended from the boom. Since Koehring is unable to demonstrate that Reese was aware of any dangerous or defective condition of the crane, it is clear that these actions do not constitute an assumption of the risk." 55 Ill. 2d 356, 360, 303 N.E.2d 382, 385.

■ We think it permissible for the jury to have inferred that decedent deactivated the dumbwaiter, left the dumbwaiter area for some reason, returned to the dumbwaiter, entered the lower access area, and met his death. The jury could also have inferred that someone closed the bifurcated doors in decedent's absence and that he inadvertently overlooked this upon his return. The evidence also permits the conclusion that a person viewing the dumbwaiter through the access door could misperceive the spreader bar as a part of the shaftway, rather than as part of the dumbwaiter cabin; as immovable, rather than movable. The evidence does not demonstrate that decedent was aware of any dangerous or defective condition of the dumbwaiter. A jury question was presented and defendants did not carry their burden of proof on the affirmative defense.

Cedar calls attention to the facts of three cases in which assumption of the risk was found as a matter of law. (*Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497; *Denton v. Bachtold Brothers, Inc.* (1972), 8 · Ill. App. 3d 1038, 291 N.E.2d 229; *Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526.) However, *Coty v. U. S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 373 N.E.2d 1371, expressly distinguishes *Ralston* and *Fore*. The plaintiffs in those cases are said to have made a considered choice in voluntarily encountering a known danger; the same may be said of *Denton*. We find the cases equally distinguishable from the case at hand.

Cedar claims that the hospital or Brannon misused the dumbwaiter because it was not foreseeable to Cedar that one would work within the · access area without first deactivating the system. Misuse is not an independent issue, but arises in connection with the plaintiff's proof of an unreasonably dangerous condition or in proximate causation. (*Williams.*) The question of misuse is for the jury. (*Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 311 N.E.2d 128.) Assuming again that plaintiff deactivated the system by opening the doors and that a hospital worker closed them, we see nothing in this so unforeseeable as to break the causal chain.

In *Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 360 N.E.2d 440, plaintiff was cleaning railroad hopper cars. The cars were used for transporting cement and their configuration was such that they could be unloaded by opening gates built into their

bottoms. The gates were about eight inches from ground level. Plaintiff was under one car attempting to free a gate that was jammed, as the gates were prone to be. A train crew, unaware of plaintiff's presence, as he was unaware of theirs, began to move the car, and plaintiff was injured. Plaintiff alleged that the gate, defectively designed in that it would jam because of cement in its grooves, caused his injury. The trial court entered summary judgment against plaintiff because he assumed the risk of injury and because the product was not a proximate cause of his injuries. The appellate court reversed, finding a triable issue of fact on causation.

### Consistency of Verdicts

■ The argument is that it is inconsistent to absolve the manufacturer (Energy) while finding liability against Cedar and the joint venture. From the evidence and issues submitted to the jury, they could properly have found that the spreader bar was the product defect which caused the death. The jury could have found that the dumbwaiter, as shipped by Energy with the notation on the spreader bar to remove the bar, was not defective. The jury could also have found that the nondefective dumbwaiter became defective when it was placed in service with the spreader bar still attached, and with the word "remove" painted over.

Cedar claims that the manufacturer has a nondelegable duty to produce a reasonably safe product. But this argument is not persuasive where the defect is clearly marked and a direction for removal of the defect is given, as in our case.

### The Jury Instruction

The joint venture contended that the words "manufacturer" and "seller" as used in the instructions should have been defined. They claim that the jury was permitted to assume that the joint venture was in the distributive chain. We need not address this issue because we have reversed the judgment as to the joint venture.

### The Hospital's Negligence

■ The hospital owed a nondelegable duty to provide decedent a safe place to work. (*Weber v. Northern Illinois Gas Co.* (1973), 10 Ill. App. 3d 625, 295 N.E.2d 41.) The hospital was required to exercise reasonable care to have the premises in good condition for the work. *American Telephone & Telegraph Co. v. Leveque* (1961), 30 Ill. App. 2d 120, 173 N.E.2d 737.

■ The jury could have found that it was negligence on the part of the hospital to permit a workman to work in the access area below the dumbwaiter without first deactivating it or informing the staff that the dumbwaiter was not to be used. The evidence permits a conclusion that

the hospital was aware that decedent would be working under the dumbwaiter.

■■ As the hospital argues, it is unlikely that it could have had knowledge of the spreader bar defect. However, it is not necessary that it foresee the precise manner in which the harm eventually occurred.

The decedent's exercise of due care deserves attention. To establish due care, plaintiff offered only circumstantial evidence. Plaintiff testified her husband had been in good health, was a good father, and was 49 years old at the time of his death. A friend testified that he knew the decedent and would trust his son's care to him. This testimony was to the effect that the decedent was a good man.

■■ In wrongful death cases where there are no eyewitnesses, evidence of decedent's prior careful habits may be admitted as tending to prove decedent's exercise of due care. Where such proof is presented, there is a presumption that the decedent was in the exercise of due care, which may be sufficient to submit the issue to the jury. *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257.

■■ In *Illinois Central R.R. Co. v. Nowicki* (1893), 148 Ill. 29, 35 N.E. 358, decedent was struck and killed by a train. There were no eyewitnesses. His wife testified that he was a sober, good, hard-working, a strong man, sound. "Proof that the deceased was a sober, industrious man, possessed of all his faculties, also tended to prove that he was in the exercise of proper care." (148 Ill. 29, 34, 35 N.E. 358, 360.) The supreme court cited with approval a statement of the California Supreme Court that ordinary care and diligence on the part of the plaintiff may be gleaned from all the circumstances of the case, his character and habits, and the natural instincts of self-preservation. To hold otherwise would be to presume negligence on the part of one in excuse of negligence on the part of another. See also *Armagast v. Medici Gallery & Coffee House, Inc.* (1977), 47 Ill. App. 3d 892, 365 N.E.2d 446: A reasonable instance of momentary forgetfulness need not be contributory negligence as a matter of law. Accord, *Ziraldo v. W. J. Lynch Co.* (1936), 365 Ill. 197, 6 N.E.2d 125.

### The Negligence of Calandrino

■■ If the jury believed that the only defect which rendered the dumbwaiter unreasonably dangerous was the presence of the spreader bar, then it follows that Calandrino was not negligent; or, if Calandrino was negligent, the negligence was a remote cause of decedent's injury. We affirm the judgment in favor of Calandrino.

McDonald-Inter American contends that it was not properly served with process and there could be no valid judgment against it. Because we reverse the judgment as to the joint venture, this question is moot.

The judgment as to the joint venture is reversed. We affirm all verdicts and judgments as entered against the remaining parties.

Reversed in part; affirmed in part.

EBERSPACHER and KARNS, JJ., concur.