FOURTH DIVISION

FILED: 1/28/99

No.  1-98-1925

PROMPT AIR, INC., an Illinois ) APPEAL FROM THE

corporation, ) CIRCUIT COURT OF

) COOK COUNTY

Plaintiff-Appellant, )

)

v. )

)

FIREWALL FORWARD, INC., )

)

Defendant-Appellee, )

)

and )

)

KELPAK INDUSTRIES, INC., ) HONORABLE

) DAVID DONNERSBERGER,

Defendant. ) JUDGE PRESIDING.

JUSTICE HOFFMAN delivered the opinion of the court: 

The plaintiff, Prompt Air, Inc., appeals from an order of the circuit court dismissing its strict product liability claim against the defendant, Firewall Forward, Inc.  In determining the propriety of the circuit court's dismissal order, we are required to address the circumstances under which the installer of defec­tive component parts can be held strictly liable in tort for resulting damages. 

The plaintiff filed the instant action against the defendant and Kelpak Industries, Inc. (Kelpak), seeking recovery for damages sustained when an airplane the plaintiff owned was required to make a forced landing due to engine failure.  The complaint, pled in three counts, sought recovery against the defendant on a strict liability theory and against Kelpak for both strict liability and fraud.  In its complaint, the plaintiff alleged that, in November 1988, Porsche-Galesburg Aircraft Sales (Porsche) contracted with the defendant for the overhaul of the subject airplane's engine.  In that same month, the defendant delivered the engine's turbocharger to Kelpak to be overhauled and repaired.  After Kelpak completed its work, it delivered the turbocharger back to the defendant.  Thereafter, the defendant completed its overhaul of the engine, reassembled it, and returned the aircraft to Porsche.  The plaintiff purchased the airplane in August 1995.  On December 20, 1995, while one of the plaintiff's employees was operating the aircraft, the engine lost all power, necessitating a forced landing.  According to the plaintiff, the engine failed because the turbocharger was defective.  Specifically, the plaintiff alleged that "the turbocharger was defective, unsafe, and not reasonably safe for its intended use in that it contained auto­motive parts rather than airplane parts." 

     Kelpak filed a special appearance and was dismissed from this action in response to its motion contesting the court's power to exercise 
in
 
personam
 jurisdiction over it.  The plain­tiff has not contested Kelpak's dismissal, and Kelpak is not a party to this appeal.  

The defendant moved for involuntary dismissal of the plain­

tiff's claim against it, contending that, as a mere installer of the turbocharger, it is not subject to strict tort liability for the plaintiff's damages.  The motion was brought pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-

619 (West 1996)), and was supported by reference to the factual allegations in the plaintiff's complaint and the affida­vit of the defendant's president.  The plain­tiff responded to the motion but filed no counteraffidavits.  The circuit court, relying on the holding in 
Hinojasa v. Auto­matic Elevator Co.
, 92 Ill. App. 3d 351, 416 N.E.2d 45 (1980), found that the plaintiff had no "cognizable cause of action as pleaded" and granted the defendant's motion.  The plaintiff has appealed.  For the reasons which follow, we reverse the order dismissing its strict tort liability claim against the defendant, and remand the cause to the circuit court for further proceed­ings.  

As we held in 
Mayfield v. Acme Barrel Co.
, 258 Ill. App. 3d 32, 34, 629 N.E.2d 690 (1994):

"Section 2-619 affords a defendant an expeditious means to obtain a summary disposition of an action based upon an affirmative bar to the plaintiff's right to recovery. [Citation.]  In ruling upon a motion brought pursuant to that section, a court must accept as true all well-pled facts in the complaint under attack [citation], and draw all inferences from those facts which are favorable to the plaintiff [citation].  However, conclusions of fact or law in the complaint which are not supported by specific factual allegations are not taken as true and are not considered by the court in ruling on the motion. [Citation.]  Such a motion should only be granted in those cases where there are no material facts in dispute and the defendant is entitled to be dismissed as a matter of law."

Since the resolution of a section 2-619 motion is a question of law, our review is 
de
 
novo
.  
Ko v. Eljer Industries, Inc.
, 287 Ill. App. 3d 35, 39, 678 N.E.2d 641 (1997).

Section 2-619(a)(9) of the Code permits a defendant to seek an order of dismissal based upon evidentiary material establish­ing that the claim asserted against it is barred by "affirmative matter" avoiding the legal effect of or defeating the claim.  735 ILCS 5/2-619(a)(9) (West 1996).  However, in the context of section 2-619(a)(9), "affir­mative matter" must be something more than evidence offered to refute the allegations contained in the complaint, which allegations must be taken as true for the purposes of a motion to dismiss.  
Bucci v. Rustin
, 227 Ill. App. 3d 779, 782, 592 N.E.2d 297 (1992); 
Cioni v. Gearhart
, 201 Ill. App. 3d 853, 856, 559 N.E.2d 494 (1990).

Based upon the well-pled allegations in the plaintiff's complaint and reasonable inferences drawn therefrom, we assume for the purposes of our review that the defendant overhauled the plane's engine and reassembled it using a defective turbocharger.  From the uncontradicted affidavit submitted in support of the defendant's motion, we will also assume that the defendant did not overhaul the turbocharger and did not incorporate automotive parts therein.  However, the affidavit of the defendant's presi­dent admits both that the turbocharger is a component part of the engine and that it was the defendant who sent the turbocharger to Kelpak to be overhauled.  That affidavit goes on to state: 

"Firewall bills its customers a flat rate, with some cost contingencies, for overhauling an engine.  In the instant matter, as is company practice, the bill for services contained no specific cost or profit for Kelpak's overhaul of the turbocharger."

     The defendant argues that, as an installer of a component part supplied by Kelpak, it was not involved in the sale of a product, received no profit from placing the defective turbocharger in the stream of commerce, and is, therefore, not subject to liability under the doctrine of strict tort lia­bility.  See 
Hinojasa
, 92 Ill. App. 3d at 354.  We believe that this argument, although viscerally appealing, fails to survive close scrutiny.

In 
Suvada v. White Motor Co.
, 32 Ill. 2d 612, 210 N.E.2d 182 (1965), our supreme court adopted the concept of strict tort liability as expressed in section 402A of the Restatement (Sec­ond) of Torts.  Under this section, strict liability is imposed upon "[o]ne who sells any product in a defective condi­tion unreasonably dangerous to the user or consumer."  Restate­ment (Second) of Torts §402A (1965).  Read literally, section 402A refers only to the strict liability of one who "sells" a product.  However, since the adoption of strict liability in 
Suvada
, the courts of this state have refused to be confined to a narrow definition of the term "seller" in determining those who are subject to strict tort liability.  See 
Bainter v. Lamoine LP Gas Co.
, 24 Ill. App. 3d 913, 915-16, 321 N.E.2d 744 (1974).  The doc­trine has been expanded to include "all persons in the distribu­tive chain" of a defective product.  
Hammond v. North American Asbestos Corp.
, 97 Ill. 2d 195, 206, 454 N.E.2d 210 (1983).  This expansive application is grounded in the very public policy reasons underlying the adoption of strict tort liability, and the determination of whether a particular transaction falls within its ambit can be made only by reference to those same policy justifications.  
Lowrie v. City of Evanston
, 50 Ill. App. 3d 376, 381-83, 365 N.E.2d 923 (1977).

When an entity is within the original chain of distribution and reaps a profit by placing a product in the stream of com­merce, imposition of strict tort liability is justified as a means of shifting the burden of loss from the injured user for two primary reasons.  First, at the point in time when the product passes through its hands, such an entity is capable of preventing the product from proceeding through the stream of commerce. 
Crowe v. Public Building Comm'n
, 74 Ill. 2d 10, 15, 383 N.E.2d 951 (1978).  Second, its position in the marketing process enables it to exert pressure on the manufacturer to enhance the product's safety.  
Hammond
, 97 Ill. 2d at 206.

In urging reversal of the trial court's order of dismissal in this case, the plaintiff relies heavily upon the decisions in 
 Court v. Grzelinski
, 72 Ill. 2d 141, 379 N.E.2d 281 (1978); 
 Brannon v. Southern Illinois Hospital Corp.
, 69 Ill. App. 3d 1, 386 N.E.2d 1126 (1978); and 
Woodrick v. Smith Gas Service, Inc.
, 87 Ill. App. 2d 88, 230 N.E.2d 508 (1967).  In each of these cases, a defendant-installer was held liable on a strict liabil­ity theory.  However, as the defendant correctly observes, each of these cases is factually dissimilar from the instant action as the defendant-

installers created the unreasonably dangerous condition in the subject products by improper installation.

The defendant bases its argument for affirmance on the holding in 
Hinojasa
 which stands for the proposition that the installer of a defective product who neither supplies the product nor creates the defect by improper installation is not subject to strict tort liability.  The 
Hinojasa
 court rested its decision on an analysis of the policy justifications underlying strict tort liability, and its conclusion that a mere installer reaps no profit from placing the product in the stream of commerce and lacks the ability to exert pressure upon the product's manufac­turer to enhance safety.  
Hinojasa
, 92 Ill. App. 3d at 354.  We have no quarrel with the general proposition of law articulated in 
Hinojasa
 or the court's supporting reasoning.  However, we take issue with the defendant's contention that 
Hinojasa
 "is factually on 'all fours' with the instant matter."

In 
Hinojasa
 the manufacturer of the defective product engaged the defendant to install it, and the defendant was required to follow the manufacture's plans and specifications.  See 
Hinojasa
, 92 Ill. App. 3d at 352-53.  Had Porsche or some agent of Porsche engaged Kelpak to overhaul the turbocharger and independently hired the defendant to install it, we would have no difficulty in applying 
Hinojasa
 and finding that, as a mere installer, the defendant is not subject to strict tort liability.  In this case, however, it was the defendant who engaged the services of Kelpak.  Further, from the affidavit of the defen­dant's own president, it can be reasonably inferred that the defendant paid Kelpak for overhauling the turbocharger and passed along the cost of that service as part of the "flat rate" it charged Porsche for overhauling the plane's engine.

One who sells, supplies, or distributes a defective product in the regular course of business incident to the rendition of a service may be held strictly liable in tort.  
Cunningham v. MacNeal Memorial Hospital
, 47 Ill. 2d 443, 450-52, 266 N.E.2d 897 (1970); 
Niffenegger v. Lakeland Construction Co.
, 95 Ill. App. 3d 420, 422-

24, 420 N.E.2d 262 (1981).  The critical question is not whether the defendant's principal function was to render a service.  Rather, the question is whether the defendant played an integral role in the distribution of a defective product.  The defendant's characterization of itself as a mere installer of the defective turbocharger is belied by the allegations contained in the plaintiff's complaint and the admissions contained in the affi­davit filed by the defendant's president.  The record in this case supports the inference that the defendant procured and paid for the reconditioning of the turbocharger by Kelpak and, there­after, installed the defective turbocharger when it reassembled the plane's engine.  Unlike the installer in 
Hinojasa
, this defendant participated in placing a defective product in the stream of commerce, derived an economic benefit therefrom, and was in a position to exert pressure to ensure the product's safety.

In view of the foregoing, we are of a belief that the policy considerations underlying the doctrine of strict tort liability justify its application to one who, in the course of rendering a service, procures and installs a defective component part.  Consequently, we find that the trial court erred in dismissing the plaintiff's strict liability claim against the defendant.

Reversed and remanded.    

SOUTH, P.J., and WOLFSON, J., concur.