In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3911

TERRY L. WINTERS,

*Plaintiff-Appellant,*

*v.*

FRU-CON INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 405—**Clifford J. Proud**, *Magistrate Judge.*

ARGUED NOVEMBER 1, 2006—DECIDED AUGUST 22, 2007

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Terry Winters' hand was severed at the wrist while he was working at a food processing plant. He reached settlements with various defendants but proceeded with his claims against Fru-Con, the company that installed the equipment that injured him. Winters appeals the exclusion of his experts' testimony and the entry of judgment in Fru-Con's favor. We affirm.

## I. HISTORY

*A. Factual History*

In December 1998, Winters began working at Gilster-Mary Lee's Centralia, Illinois plant. Gilster had recently

agreed to produce cake mix and frosting for Aurora Foods, Inc.[1] Aurora would sell the cake mix and frosting under the Duncan Hines brand name. In support of its contract with Gilster, Aurora purchased four preexisting cake mix and frosting manufacturing lines from a Proctor & Gamble plant in Jackson, Tennessee. The purchased production lines were disassembled, shipped to Illinois, and installed in the Centralia plant. Aurora hired Fru-Con to perform "all design, engineering and construction services necessary and appropriate for the relocation and installation" of the cake mix and frosting lines at the Centralia factory. R. 217 at Ex. 3. Fru-Con subcontracted with Logical Systems, Inc. to update the computer programs operating the lines.

Smoot Company, Inc., manufactured the valve that injured Winters. The valve was located at a junction of three tubes on one of the cake lines. The first tube brought cake mix to the junction point. The valve's position determined whether cake mix flowed into the second or third tube from the first tube. The second tube connected the junction point to a large mixer. The third tube connected to a storage area that was used when cake mix was not needed at the mixer. The computer control program, when in automatic mode, determined whether to send cake mix to the mixer or the storage area and altered the valve's position accordingly. Air pressure was used to move the cake mix through the tubes and also to adjust the valve's position. There is no evidence in the record that Fru-Con altered the design or structure of the tubes or diverter

---

[1] Pinnacle Foods Group, Inc. acquired Aurora during the pendency of the proceedings before the district court and was substituted as a defendant. Aurora's change in corporate structure does not affect our evaluation of the case and therefore we shall use the name Aurora consistently throughout this opinion when referring to either Aurora or its successor Pinnacle Foods.

valve when it installed the equipment at the Centralia plant. Fru-Con effectively transplanted the cake and frosting lines "as is" from the Jackson, Tennessee plant to the Centralia, Illinois plant.

The Centralia plant was not yet producing cake mix or frosting when Winters was hired in December 1998. However, during this period Winters received training from Gilster in anticipation of his work on the production line. Part of his training included viewing a videotape on "lock out / tag out" safety procedures. A lock out / tag out procedure is used by workers to allow them to safely clean and repair automated machinery. The worker wishing to work on machinery deactivates the machine's power and then places a lock and tag on that location. The lock and accompanying tag informs other workers that the first worker intentionally turned the power off in order to work on the machine and consequently the other workers should not reactivate the machine without first checking with the original worker. There is no evidence in the record that Winters received any training or instruction from Fru-Con. Although Fru-Con employees were present at the Centralia plant when the accident occurred in July 1999, there is no indication in the record that Winters had any contact with Fru-Con employees during the course of his employment.

Winters began working on a cake line as a finish mix operator in Spring 1999. As a finish mix operator, Winters was involved in the packaging of cake mix into boxes. Winters used lock out / tag out procedures when performing maintenance as a finish mix operator. He worked as a finish mix operator for five or six weeks and was then transferred to a control room operator position. As a control room operator, Winters was responsible for working on a computer that controlled the movement of cake mix ingredients along the cake line.

During the initial months of operation, the cake mix would often clump and block the flow of ingredients in the tubes on the cake lines. Control room operators, including Winters, were responsible for unclogging the clumps of cake mix in the tubes. Control room operators attempted to break up clogs by banging on the outside of the tubes or alternatively disassembling part of the cake line and reaching into the tubes. Winters testified that the practice of control room operators was not to use lock out / tag out procedures when working to unclog the cake line by hand. Instead, the control room operators placed the computer program running the cake line into manual from automatic. The control room operator would then tell other control room operators in the control room that they had placed the computer program in manual. Winters stated that he followed these alternative procedures instead of a lock out / tag out procedure because this is what he observed the other control room operators doing when he started working as a control room operator.

Winters used the alternative procedure of placing the computer on manual when the accident occurred on July 7, 1999. He disconnected one of the tubes and, through the opening, placed his arm past the Smoot diverter valve to reach the cake mix clot in the second tube. While he was pulling his arm back, a Gilster coworker, unaware that Winters was working on the cake line, placed the computer program back to automatic. The diverter valve closed on Winters' hand at the wrist with sufficient force to sever it completely. Winters was rushed to a local hospital where doctors were able to successfully reattach his hand but Winters' use of his hand has been severely limited.

### B. Procedural History

In May 2000, Winters brought suit alleging product liability and negligence claims against Fru-Con, Aurora,

Smoot Co. and Logical Systems. Winters was precluded from suing Gilster directly because of workers' compensation requirements. However, the defendants brought Gilster into the case as a third party defendant alleging that Gilster had been negligent in training and supervising Winters. By July 2001, all parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). The case was ultimately assigned to Magistrate Judge Proud. The last party was added to the case in 2002 when Aurora filed a third party declaratory action against Federal Insurance Co. Federal initially did not file a consent to Judge Proud's jurisdiction but did file a consent in March 2006 after we raised the issue in our November 23, 2005 order.

Winters reached out of court settlements with Aurora, Smoot Co. and Logical Systems but proceeded with his negligence and product liability claims against Fru-Con. Three years into the case in 2003, the magistrate judge refused Winters leave to file a proposed amended complaint in which he sought to add a claim for punitive damages. The magistrate judge also barred testimony from Winters' two experts, Edmond Israelski and H. Boulter Kelsey. Lacking an expert, the magistrate judge granted Fru-Con's motion for summary judgment on Winters' product liability claim. The case proceeded to a jury trial on the negligence claim but the magistrate judge granted Fru-Con's motion for judgment as a matter of law at the conclusion of Winters' case-in-chief. The magistrate judge also denied Winters' motion for a new trial. Winters' now seeks direct review of the judgment entered by the magistrate judge pursuant to 28 U.S.C. § 636(c)(3).

## II. ANALYSIS

Winters argues that Magistrate Judge Proud lacked subject matter jurisdiction to proceed in the case because

Federal failed to file a timely consent. On the merits, Winters argues that the magistrate judge erred by denying him leave to file his amended complaint, by barring his experts and by granting Fru-Con's motions on his product liability and negligence claims.

### A.  The Magistrate Judge's Jurisdiction

"Ensuring the existence of subject-matter jurisdiction is the court's first duty in every lawsuit." *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)). Our initial review of the record in November 2005 revealed that Federal had failed to file a consent to the magistrate judge's jurisdiction. Federal remedied this failure by filing a consent in March 2006. This is sufficient to provide us with jurisdiction as it is clear to us that all parties, including Winters, have always intended to consent to proceeding before the magistrate judge pursuant to 28 U.S.C. § 636(c). Federal's inadvertent failure to file its consent was due to late entry into the case after the case had been reassigned to the magistrate judge and Federal's after the fact consent is sufficient to manifest its consent. *See Roell v. Withrow*, 538 U.S. 580, 590 (2003) (holding that implied consent to the magistrate judge's jurisdiction can be determined by a voluntary appearance before the magistrate judge after a party has been informed of the need for consent and the right to refuse); *King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1185 (7th Cir. 1987) (noting that after the fact consent to the magistrate judge's jurisdiction is permissible if it is a manifestation of the parties' preexisting desire to consent to the magistrate judge).

### B.  Winters' Amended Complaint

We reject Winters' argument as to the magistrate judge's refusal to allow him to amend his complaint for punitive

damages three years into the litigation. Winters errone-ously argues that his ability to file his proposed pleading was limited by the Illinois pleading rule that prohibits the pleading of punitive damages in the complaint until he has established in discovery facts that support claimed punitive damages. 735 ILCS COMP. STAT. 5/2-604.1. However, the district court, as a federal court sitting in diversity, properly applied Rule 15 of the Federal Rules of Civil Procedure instead of the Illinois pleading rules because the "Federal Rules of Civil Procedure apply to all cases filed in federal court, no matter what the basis of subject matter jurisdiction." *Hefferman v. Bass*, 467 F.3d 596, 599 (7th Cir. 2006) (citing *Hanna v. Plumer*, 380 U.S. 460 (1965)); *see, e.g.*, *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005) ("As a federal court sitting in diversity by virtue of jurisdiction pursuant to 28 U.S.C. § 1332, we apply state law to resolve substantive questions and federal law to resolve procedural and evidentiary issues.") (internal quotations and citations omitted).

Thus, the issue for review is whether the district court properly denied Winters' proposed amended complaint pursuant to Rule 15. Rule 15 allows amendment of a complaint after the filing of an answer upon leave of court and leave of court shall be freely given when justice so requires. FED. R. CIV. P. 15(a). "[A] district court may deny leave to amend [a complaint] on the grounds of undue delay, bad faith, dilatory motive, prejudice or futility." *Guise v. BWM Mortgage, LLC*, 377 F.3d 795, 801 (7th Cir. 2004) (citing *Indiana Funeral Dirs. Ins. Trust. v. Trustmark Ins. Corp.*, 347 F.3d 652, 655 (7th Cir. 2003)). "We review a denial of a motion to amend only for an abuse of discretion." *Perry v. First Nat'l Bank*, 459 F.3d 816, 819 (7th Cir. 2006) (quoting *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004)). A federal trial judge's decision is an abuse of discretion "only if no reasonable person could agree with [the decision]." *Butts*,

387 F.3d at 925 (citing *Cleveland v. Porca Co.*, 38 F.3d 289, 297 (7th Cir. 1994)).

The magistrate judge's decision was not an abuse of discretion. Winters' failure to bring a timely claim for punitive damages was due to his failure to understand that federal pleading rules controlled the issue. An amended complaint three years into the litigation affects the defendant's discovery and trial strategy and therefore the magistrate judge was reasonable in rejecting Winters' proposed amendment.

## C. Barring of Experts

Winters challenges the magistrate judge's decision to exclude his two experts, Israelski and Kelsey. Israelski's proposed testimony focused on the design of the computer system operating the cake line that injured Winters. Kelsey's proposed testimony was on the Smoot valve.

Israelski was tendered as an expert in "human factors." Human factors is a discipline that incorporates a study of human behaviors, limitations and capabilities into the design of products, systems and equipment. Winters sought Israelski's testimony on the design of the computer system that operated the Smoot valve. According to Israelski's proposed testimony, the computer system was not designed properly because it did not have a means of warning the operator that a second worker had taken the Smoot valve offline for cleaning.

The magistrate judge rejected Israelski as an expert witness. He determined that Israelski's work was not performed in accordance to the standards of intellectual rigor required for admissibility. Thus, the proposed testimony was "speculative and not the result of scientific procedure. Simply put, it is not reliable." R. 202 at 6.

Kelsey was tendered as an expert in "forensic engineering analysis in the area of mechanical systems." R. 203 at 2. Kelsey's proposed opinion was that the Smoot valve and its associated control system was defective and unreasonably dangerous because (1) there was no manual guard or block that could stop the valve from shifting, (2) there was no sensor or switch that deactivated the valve when the hose was disconnected, and (3) there was no electrical circuit that stopped that valve from operating when the hose was disconnected from the line. He proposed several alternatives but he did not test the alternatives. Additionally, Kelsey criticized relying solely on a lock out / tag out procedure. The magistrate judge determined that the failure to test Kelsey's suggestions doomed his proposed opinion and excluded him from testifying.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 as well as *Daubert v. Merrell Dow Pharms., Inc." Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) (citing 509 U.S. 579 (1993)). "Expert testimony is admissible 'if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005) (citing FED. R. EVID. 702). "The district court is a 'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006). "We review *de novo* whether the district court applied the appropriate legal standard in making its decision to admit or exclude expert testimony, and we review for abuse of discretion the district court's choice of factors to include within that framework as well as its ultimate conclusions regarding the admissi-

bility of expert testimony." *Kempner Mobile Elecs., Inc.*, 428 F.3d at 712 (citing *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)). The district court identified and applied the appropriate legal standards therefore satisfying the *de novo* element of our review. *See Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 (7th Cir. 2005) (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004)).

Turning to the second step in our review, the abuse of discretion component, the district court rejected the proposed expert testimony holding that it was not reliable because the proposed experts had failed to test their alternative designs. One of the "purpose[s] of the *Daubert* standard is to ensure that any admitted scientific evidence is reliable; that is, well-grounded in methods and procedures of science. The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 536 (7th Cir. 2000); *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996)). "*Daubert* offers a non-exclusive list of factors to aid judges in determining whether [a] particular expert opinion is grounded in reliable scientific methodology. Among the factors articulated are: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert*, 509 U.S. at 593-94).

"In alternative design cases, we have consistently recognized the importance of testing the alternative design" as a factor that the district court should consider

in evaluating the reliability of the proposed expert testimony. *Dhillon*, 269 F.3d at 870 (citing *Bourelle*, 220 F.3d at 535-38; *Cummins*, 93 F.3d at 368). Testing an alternative design can assist a proposed expert in considering: (1) the alternative's compatibility with existing systems, (2) relative efficiency of the current versus alternative design, (3) short and long term maintenance costs for the alternative design, (4) ability of the proposed purchaser to service and maintain the alternative design, (5) cost of installing the alternative design, and (6) change in cost to the machine. *Dhillon*, 269 F.3d at 870 (citing *Cummins*, 93 F.3d at 369). "Many of these considerations are product and manufacturer specific and cannot be reliably determined without testing" of the alternative design. *Id.* Although testing an alternative design will likely be advantageous in demonstrating that the proposed expert's testimony is reliable, we have not mandated alternative design testing as "an absolute prerequisite to the admission of expert testimony" because the *Daubert* inquiry is a "flexible inquiry." *Cummins*, 93 F.3d at 368-69. There could be situations where the district court determines the proposed expert's testimony regarding an alternative design is reliable despite a lack of testing of the alternative design because the expert has adhered to the "standards of intellectual rigor that are demanded in [his or her] professional work," such as relying on the data generated by other researchers, making proper personal observations or taking other appropriate actions. *Id.* at 369 (citing *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994); *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 n.6 (7th Cir. 1993)). The appropriateness of the proposed expert's methodology is a question for the district court in its role as a gate-keeper. "An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless." *Clark v.*

*Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (internal quotations omitted).

The district court properly exercised its discretion in finding that Winters' proposed experts were not reliable and therefore properly rejected their tendered expert testimony. The proposed experts both failed to test their alternative designs and also failed to utilize any other method of research to compensate for their lack of alternative testing. Thus, their proposed opinion is based on a belief that alteration to add a safety improvement is appropriate and therefore there is no need to determine the reliability of their alternatives. "Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)." *Id.*

Finally, Winters argues that the district court erred in failing to reopen discovery to allow his proposed experts to conduct testing of their alternative designs. Winters sought to reopen discovery after the district court decision barring his proposed experts. "We review the district court's decision not to reopen discovery for abuse of discretion." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 603 n.2 (7th Cir. 2006) (citing *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000)). The litigation process does not include "a dress rehearsal or practice run" for the parties. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). Winters had ample time to develop his case and conduct his testing of his alternative design during the discovery period. His inability to produce admissible expert testimony is due to his own actions, namely the failure of his proposed experts to test their alternatives. The district court was not required to give Winters a "do over" and therefore we find that the district court did not abuse its discretion.

*D. Judgment for Fru-Con on Winters' Tort Claims*

Winters, bringing his tort claims under Illinois law, alleged that the conveyance system that injured him contained dangerous conditions that were defective and not reasonably safe. The district court granted Fru-Con's motion for summary judgment on Winters' strict liability claim due to the exclusion of Winters' experts. The district court granted Fru-Con's motion for judgment as a matter of law on Winters' negligence claim after determining that Fru-Con did not owe him a duty of care.

"We review grants of summary judgment *de novo.*" *Lummis v. State Farm Fire & Cas. Co.*, 469 F.3d 1098, 1099-1100 (7th Cir. 2006) (citing *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 475 (7th Cir. 2004); *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003)). "We may affirm summary judgment on any basis we find in the record." *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999) (citing *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). In evaluating a motion for summary judgment, the district court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) ("The primary purpose of summary judg-

ment is to isolate and dispose of factually unsupported claims.").

The district court properly granted summary judgment for Fru-Con on Winters' product liability claim because Winters had failed to develop evidence sufficient to meet his burden of proof at trial. Illinois applies the strict liability doctrine as set forth in § 402A of the Second Restatement of Torts and therefore, "strict liability is imposed upon a seller of any product in a defective condition unreasonably dangerous to the user or consumer or to his property." *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249, 254 (Ill. 2007) (citing *Suvada v. White Motor Co.*, 210 N.E.2d 182, 187 (1965); RESTATEMENT (SECOND) OF TORTS § 402A). "A manufacturer has a nondelegable duty to produce a product that is reasonably safe for all intended uses." *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 43 (Ill. 2002) (citing *Doser v. Savage Mfg. & Sales, Inc.*, 568 N.E.2d 814, 819 (Ill. 1990)). "A plaintiff may demonstrate that a product is defective in design . . . (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." *Lamkin v. Towner*, 563 N.E.2d 449, 457 (Ill. 1990). The first test is referred to as the "consumer expectation test," and the second test is known as the "risk utility" or "risk benefit" test. *Hensen*, 764 N.E.2d at 43.

"Under the consumer expectation test, a plaintiff must establish what an ordinary consumer purchasing the product would expect about the product and its safety. This is an objective standard based on the average, normal, or ordinary experiences of the reasonable person; it is not dependent upon the subjective expectation of a

particular consumer or user." *Calles*, 864 N.E.2d at 255. Winters failed to develop any evidence to determine what an ordinary consumer would expect about the cake line and its operation. Therefore, we shall next consider the risk utility / risk benefit test.

"Under the risk utility test, . . . a plaintiff may prove a design defect by presenting evidence of the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Id.* at 263-64. Winters' primary evidence was his proposed experts that he wanted to present in support of an alternative design argument but this evidence was properly excluded by the district court because of Winters' failure to comply with *Daubert* and Rule 702. Thus, Winters attempts to fall back to his only remaining evidence, an alleged failure to comply with OSHA requirements. However, Winters does not explain how these regulations would impact any proposed alternative design of the cake line or how this would be an improvement on the design of the cake line. All that remains is Winters' belief that the design was defective and mere belief without evidence in support is not sufficient to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *see, e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (citing *Johnson*, 325 F.3d at 901).

Additionally, even if Winters had provided sufficient evidence to survive summary judgment, summary judgment in favor of Fru-Con was still appropriate because, as a matter of law, Fru-Con cannot be held strictly liable under § 402A. Although a literal reading of § 402A would limit strict liability only to sellers of a product, Illinois applies strict liability to "all persons in the distributive

chain of a defective product." *Prompt Air, Inc. v. Firewall Forward, Inc.*, 707 N.E.2d 235, 238 (Ill. App. Ct. 1999). "[T]he major purpose of strict liability is to place the loss caused by a defective product on those who create the risk and reap the profit by placing such a product in the stream of commerce, regardless of whether the defect resulted from any negligence of the manufacturer." *Carollo v. Al Warren Oil Co., Inc.*, 820 N.E.2d 994, 1001 (Ill. App. Ct. 2004) (citing *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 53 (Ill. 1997); *Liberty Mut. Ins. Co. v. Williams Mach. & Tool Co.*, 338 N.E.2d 857, 860 (Ill. 1975)).

Fru-Con was not involved in placing the cake line into the stream of commerce but installed, without alteration, the cake line that had been transported to the Illinois factory from Tennessee. "[T]he policy reasons which justify extending the doctrine of strict liability to parties such as retailers or distributors are [not] applicable to product installers" when the installer does not participate in placing the product into the stream of commerce. *Hinojasa v. Automatic Elevator Co.*, 416 N.E.2d 45, 48 (Ill. App. Ct. 1980). Strict liability is not applied to the installer because (1) they are not involved in the sale of the product, (2) they did not receive any profit from the placing of the defective product in the stream of commerce, and (3) the installer lacks the purchasing power of a retailer or distributor and therefore cannot exert pressure on the manufacturer to enhance product safety. *Hinojasa*, 416 N.E.2d at 48 (citing *Peterson v. Lou Bachrodt Chevrolet Co.*, 329 N.E.2d 785, 787 (Ill. 1975)). "The critical question is not whether the defendant's principal function was to render a service. Rather, the question is whether the defendant played an integral role in the distribution of a defective product." *Prompt Air, Inc.*, 707 N.E.2d at 239. As Fru-Con was not involved in the distribution of the cake line or the Smoot valve, it cannot be held strictly liable. Additionally, any

alterations done to the cake lines were done by Logical Systems, a defendant with whom Winters has already settled.

As to the district court's entry of judgment as a matter of law on Winters' negligence claim, "we review *de novo* the grant of a Rule 50(a) judgment as a matter of law." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 886 (7th Cir. 2001) (citing *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924 (7th Cir. 2000)). "Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Alexander v. Mount Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 902 (7th Cir. 2007) (citing *Murray*, 252 F.3d at 886). "The standard governing a Rule 50 motion mirrors that employed in evaluating a summary judgment motion" except that the two motions are made at different times during the proceedings before the district court. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

"A product liability action asserting a claim based on negligence . . . falls within the framework of common law negligence." *Calles*, 864 N.E.2d at 270 (citing *Flaugher v. Sears, Roebuck & Co.*, 378 N.E.2d 337, 340 (1978)). "[T]o state a claim for negligence, the plaintiff must establish that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the plaintiff was injured as a proximate result of such breach." *Gilley v. Kiddel*, 865 N.E.2d 262, 274-75 (Ill. App. Ct. 2007) (citing *Milz v. M.J. Meadows, Inc.*, 599 N.E.2d 1290, 1293 (Ill. App. Ct. 1992)). Winters argues that Fru-Con had a duty to ensure his safety under Fru-Con's contract that governed Fru-Con's work at the Illinois plant. Fru-Con was

required to ensure worker safety during its work at the plant. "The question of whether a duty exists . . . is determined by the terms of the contract, and the duty, if any, will not extend beyond that described in the contract." *Putman v. Village of Bensenville, Illinois*, 786 N.E.2d 203, 208 (Ill. App. Ct. 2003) (citation omitted). Fru-Con's contract did not establish a duty between Fru-Con and Winters. The scope of Fru-Con's work was to install the cake and frosting lines. Fru-Con was responsible for safety during its work. However, Winters was not injured by the installation work but instead by the operation of the cake line after the installation was finished. The injury was outside the installation process and therefore outside of Fru-Con's duty as established by its contract. Fru-Con was responsible only for the installation of the cake and frosting lines. Its workers were at the plant but did not supervise or otherwise interact with Winters in a professional capacity. Winters has already reached settlements with Aurora, Smoot Co. and Logical Systems but he is not entitled to anything from Fru-Con.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*