TRANSCON, INCORPORATED, Plaintiff and Counterdefendant, Appellee, *v.* MOTION INCORPORATED, Defendant and Counterplaintiff, Appellant.

(No. 57036;

First District (5th Division)—July 20, 1973.

*Rehearing denied September 11, 1973.*

David J. Gibbons and Juris Kins, both of Chicago, (Chadwell, Kayser, Ruggles, McGee, Hastings & McKinney, of counsel,) for appellant.

Merrill B. Meyer and Charles L. Wolberg, both of Chicago, (Rappaport, Clorfene & Rappaport, of counsel,) for appellee.

Mr. PRESIDING JUSTICE DRUCKER delivered the opinion of the court:

Transcon, Incorporated, (Transcon) filed an action against Motion Incorporated (Motion) to recover sums allegedly due it from sales to Motion. Motion filed a counterclaim against Transcon asking for damages for Transcon's alleged breach of an exclusive territorial sales representative contract with Motion. After a bench trial Transcon was awarded $5239 on its claim, and the court found against Motion on the counterclaim. Motion appeals only from that portion of the judgment denying it relief on the counterclaim.

On appeal Motion contends that as a matter of law Transcon breached its contract with Motion. Also, Motion asks this court to enter judgment in its favor for $28,147.38, the damages suffered by Motion assuming the existence of a breach.

Transcon is a manufacturer of industrial conveyors. It was formed in 1959 by former employees of Mayfran Corporation (Mayfran). Both companies manufacture industrial conveyors. Motion is a sales representative for various metal handling equipment manufacturers. The other corporate entity involved is Industrial Specialties Corporation (Industrial). It was formed in 1966 by Gilbert Haggerty, an ex-Mayfran salesman who operated in Illinois during his last three years with Mayfran. Industrial is located in Barrington, Illinois. It does some manufacturing on its own premises and some by "fabshops" off the premises. It purchases conveyors from manufacturers and combines them into a complete industrial system.

On January 20, 1966, Transcon and Motion entered into a contract (drafted by Transcon) whereby Motion was to serve as Transcon's exclusive sales representative in northern Illinois and western Iowa. This area was increased on February 9, 1966, to include three counties in

northern Indiana. The contract provided that Motion would solicit orders for Transcon equipment in the aforementioned areas; that any orders were not to be deemed accepted until approval thereof was given by Transcon at its home office in Mentor, Ohio; and that the agreement would run from year to year, but that either party could terminate upon 30 days written notice. The commission schedule under which Motion was to operate was also set forth.

Paragraph 7 of the contract which is the subject of the dispute provides in relevant part:

"(7) You [Motion] shall not receive commission on the following transactions except as special permission for handling the account and special commission has been arranged.

(a) O.E.M. sales to original equipment manufacturers unless special permission has been granted to handle the account. * * *."

The term "O.E.M." or original equipment manufacturers was not defined in the contract.

When Gilbert Haggerty formed Industrial in June, 1966, he offered Industrial's service to Transcon. He was informed that Motion was Transcon's sales representative in the relevant area. Haggerty told Transcon that Industrial was going to purchase conveyors and not work as a sales representative. Transcon sold its first conveyor to Industrial in June, 1966. The conveyor was shipped directly to the ultimate user, i.e., Industrial's customer. Thereafter, until August 20, 1969, Industrial made 77 other sales of Transcon conveyors. All the sales were made to customers within Motion's selling territory; all conveyors were shipped directly from Transcon to Industrial's customer; and they all bore the name Transcon.

In selling its equipment systems, Industrial would inspect a customer's plant, take appropriate measurements and decide what equipment was needed. If Transcon equipment was required, Industrial would call Transcon and inform it of the dimensions and type of conveyor needed. Transcon would quote Industrial a price which Industrial then passed on to its customer. If the customer agreed to make the purchase, Industrial would forward a draft copy of the conveyor to Transcon and ask it to build it for the given sum. Transcon would then send Industrial a drawing of the conveyor and if approved by Industrial, a conveyor would be sent directly to the customer. Transcon would bill Industrial, and Industrial would bill its customer. Industrial assumed responsibility for the conveyor's performance after installation.

Motion would solicit orders for Transcon conveyors. If such a conveyor was needed, a Motion salesman would take the necessary measurements and other information. A blueprint and data sheet were prepared by

Motion and sent to Transcon for a price quotation. The quoted price would be related to the customer and if he accepted it, a purchase order was sent to Transcon. Delivery was made to the customer's plant. Motion would then inspect it to see that it complied with the specifications and assisted in the installation. Transcon would then pay it a commission. Motion was responsible for servicing the equipment it sold.

From June, 1966, to August 20, 1969, (when Transcon cancelled the contract) Motion sold 14 Transcon conveyors. During this period Motion had attempted, unsuccessfully, to sell Transcon conveyors to many companies who, unbeknown to Motion, had bought them from Industrial.

In November, 1966, Transcon informed Motion that there were a total of 27 "O.E.M. Machine Tool Builders" or original equipment manufacturers; that the three in Motion's territory were East Chicago Machine Tool Company, Barnes Drill and Dahlstraum Machine Tool Company and that these companies constructed complete "turn key" systems in which the Transcon conveyor was only an integral part.

Motion's contract with Transcon prohibited Motion from advertising without Transcon's permission. Such permission was granted and Motion advertised as Transcon's sales representative in the yellow pages of the telephone book. The same permission was also given to Industrial and in 1969 both Motion and Industrial were listed as Transcon sales representatives in the telephone book. Transcon distributed sales brochures to its sales representatives. Motion used this brochure in promoting Transcon sales. On the back of the brochure was a space for the representative to place its name and address. Industrial received the same brochure which it used in promoting sales and placed its name and address on it as a distributor of Transcon equipment.

Motion became aware of Industrial's activities when informed of such by a former Transcon sales manager and when a company asked Motion for replacement parts for Transcon equipment which Motion had not sold it. Motion then complained to Transcon about Industrial's sales within its territory and refused to make payment for Transcon equipment it held. Transcon cancelled the contract on August 20, 1969, asserting that "sales to O.E.M. accounts are the only sales we have made in the area."

Three persons testified as to what constituted an original equipment manufacturer (or an "O.E.M."). Motion's president testified that an O.E.M. was a company that produced equipment, and the conveyor would only be part of the equipment sold to its customers. The Transcon conveyors sold by Industrial were installed without further manufacturing by Industrial and used as delivered to the customer. Transcon's president testified that an "O.E.M." is a company which takes title to a piece of

equipment, is billed by Transcon for the purchase price, does its own selling, takes responsibility for the equipment and does design work. A sales representative never does design work but merely takes measurements. The president of Hardy Corporation testified for Transcon and stated that he considered an "O.E.M." to be one who designed industrial equipment systems. He believed that his company produced everything on "an O.E.M. basis" even though it had no factory. All component parts in a system were shipped directly from the manufacturer to a Hardy customer. He considered the term "original equipment manufacturer" to be a misnomer since, as he stated, "we don't manufacture but purchase."

It is undisputed that if Motion was given credit for the 78 sales of Transcon conveyors by Industrial, its commission, as per its contract with Transcon, would total $28,147.38.

OPINION

Motion contends that as a matter of law Transcon breached the exclusive sales representative contract between the parties and therefore Motion is entitled to damages on its counterclaim.

The contract between Transcon and Motion provides that Motion is exclusively entitled to make sales in the pertinent geographical area except when Transcon makes a sale to an "original equipment manufacturer," i.e., an "O.E.M." Thus the pivotal issue is whether Industrial Specialties, which made 78 sales in Motion's area, is an "O.E.M." If it is not, then Motion prevails, and if it is, Motion does not.

■■ It is well established that each word in a contract should be given its plain and ordinary meaning. (*State Toll Highway Com. v. Boyle & Co.*, 38 Ill.App.2d 38, 51, 186 N.E.2d 390.) Motion argues, and we agree, that in order for a company to be an "original equipment manufacturer" it must first be a "manufacturer." Any other interpretation given to the phrase would ignore the presence of the word "manufacturer" and be contrary to the accepted rule that no word in a contract is to be considered as mere surplusage and thus meaningless. (*McPike v. Luer*, 230 Ill. App. 271, 274; *O'Fallon Development Co. v. Reinbold*, 69 Ill. App.2d 169, 216 N.E.2d 9.) We therefore turn to the definition of the word "manufacturer" and determine whether Industrial's activities vis-a-vis its transactions with Transcon place it within the meaning of the word.

In *Dolese & Shephard Co. v. O'Connell*, 257 Ill. 43, 45, 100 N.E.235, the court defined the term "manufacturing" as follows:

"Whenever labor is bestowed upon an article which results in its assuming a new form, possessing new qualities or new combinations, the process of manufacturing has taken place, * * * *."

See *City of Chicago v. Reuter Bros. Iron Works*, 314 Ill. App. 315, 318, 41 N.E.2d 213. A manufacturer would be one who performed the cited activities.

It is clear from the record that Industrial bestowed no labor upon Transcon conveyors other than assisting in their installation and servicing them thereafter. These activities are of no consequence here in that they did not result in the conveyor "assuming a new form" or "possessing new qualities." (*Dolese* at 45.) In fact, Industrial's activities closely parallel those of Motion. Both companies would solicit orders, determine whether a Transcon conveyor was needed and inform Transcon as to the relevant data. Transcon would then quote each of them a price which each passed on to its customer. At this point in Industrial's sales procedure it would forward a draft copy of the desired conveyor to Transcon, and Transcon would then submit a drawing of the equipment for Industrial's approval. This was not done with Motion. But thereafter, in both cases, Transcon would ship the conveyor directly to the ultimate user. Both Motion and Industrial serviced the conveyors after installation. Motion and Industrial would use the same Transcon brochures to promote sales, and both were given permission to advertise as Transcon sales representatives in the yellow pages of the telephone book. It appears that the only substantive distinction between Motion and Industrial in their respective relationships with Transcon is that Industrial may have exercised more sophisticated engineering skills than Motion. But Industrial's activities took on nowhere near the complexity of that of the three corporations which Transcon stated were "original equipment manufacturers" in its letter to Motion in November 1966. We consider it highly significant that the first Transcon sale to Industrial occurred on June 15, 1966, and that the cited letter to Motion, dated about five months thereafter, did not refer to Industrial as an "O.E.M." in the relevant territory.

A somewhat analogous situation was presented in *Rubinger v. International Telephone & Telegraph Corp.*, 193 F.Supp. 711 (S. D. N.Y. 1961), aff'd 310 F.2d 552 (2d Cir. 1962), *cert. den.* 375 U.S. 820. There an exclusive territorial distributor for a manufacturer of televisions, radios and stereo equipment sued the manufacturer for commissions allegedly due it prior to termination of the contract. As in the instant case, the contract provided that no commissions would be due the distributor if the manufacturer made sales to other manufacturers in the area. Two sales were made to a company which placed the manufacturer's equipment in its own cabinets and sold them in combination. The court held that this did not make the company a manufacturer within the terms of the contract and that commissions were thus due to the exclusive

territorial distributor on the sales. In the instant case Industrial did not even make the modest combination of products evidenced in *Rubinger*.

The contract is unambiguous as to the fact that Transcon could make sales in Motion's territory (without being obligated to pay Motion the full commission) only to persons who performed a manufacturing function.

■■ We therefore conclude that as a matter of law Industrial was not an "original equipment manufacturer" and therefore Motion is entitled to a commission for the 78 sales of Transcon equipment made by Industrial.

■■ It is undisputed that Motion would have received $28,147.38 in commissions if credited with the sales made by Industrial. This figure is based upon the commission schedule in the Transcon-Motion contract. It will therefore be unnecessary to remand the cause for a hearing on the issue of damages. See Ill. Rev. Stat. 1971, ch. 110A, par. 366(a)(5).

In conclusion, the judgment denying relief on the counterclaim is reversed and the cause is remanded with directions to enter judgment for Motion and against Transcon on the counterclaim in the sum of $28,147.38.

Reversed and remained with directions.

ENGLISH and SULLIVAN, JJ., concur.