JACK CAROLLO, Plaintiff-Appellant and Cross-Appellee, v. AL WARREN OIL COMPANY, INC., *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division) No. 1—03—0105

Opinion filed November 24, 2004.

Freeborn & Peters, L.L.P., of Chicago (Daniel J. Voelker and Robert J. Hall, of counsel), for appellant.

Clausen Miller, P.C. (James T. Ferrini and Ann C. Chalstrom, of counsel), and Law Offices of Scott G. Thomas (Richard M. Jacobson, of counsel), both of Chicago, for appellees.

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiff, Jack Carollo, appeals from (1) an order granting summary judgment in favor of defendants, Al Warren Oil Company, Inc. (Warren), and Altom Transport, Inc. (Altom) (referred to collectively as defendants), and (2) the trial court's decision that found defendants severally liable, as opposed to jointly liable, for plaintiff's noneconomic damages. Defendants have cross-appealed from the trial court's denial of their motion for judgment notwithstanding the verdict. We affirm.

# BACKGROUND

On May 13, 1998, plaintiff was seriously injured in an explosion at work. At the time, plaintiff was working for Premier Fuel & Cartage, Inc. (Premier)[1], providing fueling services at McCormick Place. Plaintiff routinely drove a tanker truck, referred to as A-2, from which he would fuel small vehicles in various locations in the Chicagoland area and then return to Premier for refueling. Premier had purchased A-2, as well as A-3, an even larger tanker truck, from defendants in 1993 and 1994, at the time Premier began its fuel business. Altom is a 48-state trucking company that provides cartage for chemicals and petroleum products. Warren is a bistate wholesaler and retailer of motor fuels, heating oils, and chemicals.

A-2's tank had four separate compartments, each holding 500 gallons of either diesel fuel or gasoline. The Chicago fire department (CFD) had originally owned A-2's tank, which it used as a mobile fuel station to fill up CFD equipment. Altom purchased the tank from the CFD and used it for over eight years before selling it to Premier. There was no owners' manual with this used equipment when Altom purchased it. The tank, as purchased by Altom, had bottom-loading capabilities; on the right side of the tank toward the bottom, a series of valves allowed "bottom-loading" transfer of fuel into A-2, making it unnecessary to refuel the truck from the top.

When Altom purchased the tank from the CFD, the tank did not have a static reel, which is a grounding device. The tank also did not have a fill pipe. A fill pipe can be part of either the tank or the fuel hose. For example, the fuel hose could have a long nozzle that could reach near the bottom of the tank to reduce splashing and static buildup when the fuel hose is inserted inside the tank during fueling.

Dennis Epley, an Altom employee, testified that he and other Altom employees assembled A-2 for resale to Premier. A-2's assembly took approximately 200 hours. A-2 was assembled from an old, twice pre-owned, used tank, mounted on a chassis. The employees removed the tank from its older chassis and affixed it to a new chassis; this installation took around eight hours. The remainder of the time was spent painting the tank, replacing the rotted-out piping, reinstalling the valves, and conducting tests required by the Environmental Protection Agency and the Department of Transportation. A-3 was assembled in the same manner as A-2.

On the day of the accident, plaintiff was refueling A-2 from A-3, as he had been instructed. Plaintiff parked A-2 next to A-3, took the

---

[1]On September 24, 2002, Premier, a third-party defendant, was dismissed from this lawsuit pursuant to an agreement between it and defendants.

diesel hose attached to A-3, climbed on top of A-2, and opened the hatch to compartment number two, one of four compartments in the tank on A-2. Compartment number two held diesel fuel. Plaintiff switched the valve on the hose from diesel fuel to gasoline and waited for the diesel fuel remaining in the hose to clear out into the diesel compartment. Plaintiff planned to refuel A-2's gasoline compartments after the streaks of diesel fuel, which is a yellow-green color, dissipated. He watched for the gasoline, which is clear, to start coming out of the hose. As the fuel became clearer, with just a few yellow-green streaks remaining, a ball of fire knocked plaintiff off A-2 to the ground. After the explosion, plaintiff noticed that his hair and shirt were on fire. He tore off his shirt. The last thing plaintiff remembered was running to the dispatcher to wait for an ambulance.

As a result of the explosion, plaintiff suffered serious injuries and required extensive medical treatment. He was initially taken to Cook County hospital, where he was on a respirator for approximately three weeks. Thereafter, he was treated at Loyola Hospital for five days. Many of plaintiff's burns were third-degree, while the burns on his face were first-degree and those on his hands were second-degree. Plaintiff received skin grafts that were ultimately successful, although there were rejections from time to time. Plaintiff's skin lost elasticity and his muscles were weakened. As a result, plaintiff sustained a painful torn muscle. He also suffered from a complication that caused hearing loss. In addition to his physical injuries, plaintiff suffered from post-traumatic stress syndrome and depression that required medication and therapy.

On April 28, 1999, plaintiff filed a two-count complaint against defendants. Count I sounded in strict products liability. Count II was based on negligence. On July 9, 2001, the trial court granted defendants' motion for summary judgment on count I. On January 25, 2002, plaintiff filed a first amended complaint. Count I, based on strict liability, was repleaded for purposes of preserving the issue for appeal. Count II sounded in negligence. Count III was based on *res ipsa loquitur*. On April 9, 2002, the trial court granted defendants' motion for summary judgment on count III and that decision is not at issue in this appeal. On August 30, 2002, defendants filed a motion for judgment on the pleadings as to count II of plaintiff's amended complaint, which was denied.[2]

---

[2]We are unable to locate a copy of the order in the record, and the parties do not discuss in detail the procedural history of the case prior to trial. However, because the case proceeded to trial on plaintiff's negligence claim, we presume defendants' motion was denied.

On September 26, 2002, a jury trial commenced on plaintiff's negligence claim. On October 2, 2002, after a several-day trial, the jury found in favor of plaintiff. The jury determined that plaintiff had sustained damages in the amount of $1,057,600 and allocated the percentage of fault as follows: plaintiff—15%, Warren—15%, Altom—18%, and Premier—52%. After taking into account plaintiff's percentage of fault (15%), the jury awarded plaintiff recoverable damages in the amount of $899,050.

The trial court deferred entry of the judgment, directing the parties to brief the impact of section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 2000)) upon the amount of damages for which each defendant was responsible. The trial court, relying on the case of *Lilly v. Marcal Rope & Rigging, Inc.*, 289 Ill. App. 3d 1105, 682 N.E.2d 481 (1997), concluded that the employer, Premier, should not be considered in the allocation of fault under section 2—1117 and redistributed Premier's 52% of fault, *pro rata*, among plaintiff, Warren and Altom.

The Illinois Supreme Court subsequently decided *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 783 N.E.2d 1024 (2002), which overruled *Lilly*. Defendants filed a posttrial motion requesting judgment notwithstanding the verdict or, alternatively, entry of judgment in accordance with *Unzicker*. On December 30, 2002, the trial court denied defendants' request for judgment notwithstanding the verdict, but entered judgment pursuant to *Unzicker*. As a result, each defendant was only severally liable for its proportionate share of plaintiff's nonmedical damages, and jointly and severally liable for his medical expenses. On January 2, 2003, plaintiff filed this appeal. Defendants filed a cross-appeal on January 7, 2003.

PLAINTIFF'S APPEAL

I. Whether the Trial Court Correctly Granted Summary Judgment to Defendants on Plaintiff's Strict Liability Claim

Plaintiff first contends that the trial court erred when it granted defendants' motion for summary judgment on the strict liability count (count I).[3] Plaintiff asserts that summary judgment should not have been entered because a genuine issue of material fact existed as to whether defendants designed, manufactured, distributed or sold trucks.

■ We first note the following well-established principles regarding summary judgment. A trial court may render summary judgment if

---

[3]That motion was heard by a different trial court judge prior to the time that Judge Nudelman was assigned the matter for trial.

the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002). A reviewing court conducts *de novo* review in an appeal from a trial court's grant of summary judgment. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323, 1326 (1995). An order granting summary judgment should be reversed if the evidence shows that a genuine issue of material fact exists or if the judgment was incorrect as a matter of law. *Clausen v. Carroll*, 291 Ill. App. 3d 530, 536, 684 N.E.2d 167, 171 (1997). To survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle him to a judgment, but plaintiffs are not required to prove their case at the summary judgment stage. *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256, 665 N.E.2d 1246, 1254 (1996). Summary judgment is a drastic means of disposing of litigation, and it must be clear that the moving party is truly entitled to such a remedy. *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 7, 688 N.E.2d 106, 108-09 (1997). When considering a summary judgment motion, a court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party. *Guerino v. Depot Place Partnership*, 273 Ill. App. 3d 27, 30, 652 N.E.2d 410, 413 (1995). A motion for summary judgment should be granted only if the movant's right to judgment is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). With these principles in mind, we conclude that the trial court erroneously granted summary judgment to defendants on plaintiff's strict liability count.

In his strict liability count, plaintiff alleged both design defects and manufacturing defects. Plaintiff also contended that defendants designed, manufactured, distributed *and* sold the A-2 and A-3 tanker trucks in an unreasonably dangerous condition. Plaintiff further argues on appeal that defendants are subject to strict liability as installers. Defendants assert that they were "mere consumers and resellers of a secondhand product."

■ Section 402A of the Restatement (Second) of Torts provides as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." Restatement (Second) of Torts § 402A (1965).

In *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965), our supreme court adopted the strict liability doctrine found in section 402A of the Restatement (Second) of Torts. In so doing, the court examined the arguments that had been made in support of imposing strict liability in cases involving food and stated as follows:

"[I]t seems obvious that public interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present and as compelling in cases involving motor vehicles and other products, where the defective condition makes them unreasonably dangerous to the user, as they are in food cases." *Suvada v. White Motor Co.*, 32 Ill. 2d at 619, 210 N.E.2d at 186.

Comment *c* of section 402A contains the following general statement of the underlying social policy for the strict liability doctrine:

"On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." Restatement (Second) of Torts § 402A, Comment *c*, at 349-50 (1965).

See also *Lowrie v. City of Evanston*, 50 Ill. App. 3d 376, 365 N.E.2d 923 (1977).

Thus, the major purpose of strict liability is to place the loss caused by a defective product on those who create the risk and reap the profit by placing such a product in the stream of commerce, regardless of whether the defect resulted from any negligence of the manufacturer. *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill. 2d 21, 37-38, 682 N.E.2d 45, 53 (1997); *Liberty Mutual Insurance Co. v. Wil-*

*liams Machine & Tool Co.*, 62 Ill. 2d 77, 82, 338 N.E.2d 857, 860 (1975).

■ In a products liability action, all persons in the distributive chain, including suppliers, distributors, wholesalers and retailers, are liable for injuries resulting from a defective product. *Hammond v. North American Asbestos Corp.*, 97 Ill. 2d 195, 206, 454 N.E.2d 210, 216 (1983). Even a party, not within the actual chain of distribution, who plays an integral role in the marketing enterprise of a defective product and participates in the profits derived from placing the product into the stream of commerce is held liable under the doctrine of strict liability. *Bittler v. White & Co.*, 203 Ill. App. 3d 26, 29-30, 560 N.E.2d 979, 980 (1990), citing *Connelly v. Uniroyal, Inc.*, 75 Ill. 2d 393, 389 N.E.2d 155 (1979). Liability may result regardless of whether any of the parties actually knew of the defect, contributed to the defect, or failed to discover the defect. *Sims v. Teepak, Inc.*, 143 Ill. App. 3d 865, 868, 493 N.E.2d 721, 723 (1986).

As the Illinois Supreme Court has explained:

"A seller who does not create a defect, but who puts the defective product into circulation, is still responsible in strict liability to an injured user. Because the ultimate loss will ordinarily be borne, through indemnification, by the party that created the defect, the public policy concern is really who, between the injured user and the seller, should bear the initial loss. The seller is in a position to prevent a defective product from entering the stream of commerce. The seller may either adopt inspection procedures or influence the manufacturer to enhance the safety of a product. Moreover, the seller is generally better able to bear and distribute any loss resulting from injury caused by a defective product." *Crowe v. Public Building Comm'n of Chicago*, 74 Ill. 2d 10, 13-14, 383 N.E.2d 951, 952 (1978), citing Restatement (Second) of Torts § 402A, Comment *c* (1965).

■ "To be in the stream of commerce [and subject to strict liability] does not require that the product be mass-produced or placed on the shelf at numerous locations. It is sufficient if the defendant is engaged in the business of selling the product and markets it to a buyer for the buyer's use." *Skarski v. Ace-Chicago Great Dane Corp.*, 138 Ill. App. 3d 301, 306-07, 485 N.E.2d 1312, 1316 (1985).

### A. The Circuit Court Erred When It Decided, as a Matter of Law, That Defendants Were Not Sellers

It is undisputed that defendants sold the trucks to plaintiff's employer. Nonetheless, in order to be held liable under the doctrine of strict liability, a defendant seller must "be engaged in the business of selling the particular product." *Siemen v. Alden*, 34 Ill. App. 3d 961,

963, 341 N.E.2d 713, 715 (1975). In their motion for summary judgment, defendants contended that they were not in the business of selling tanker trucks. Citing *Siemen v. Alden*, defendants asserted that they could not be held responsible for plaintiff's injuries under a theory of strict liability because an "occasional seller" is not subject to strict liability. In support of their motion, defendants attached the affidavit of Thomas Warren, president of both defendant corporations. Mr. Warren testified that defendant Altom was in the business of transporting petroleum products and that defendant Warren was in the business of distribution of oil products. He testified that neither defendant was in the business of designing, manufacturing, distributing or selling new tanker trucks.

■ Comment *f* to section 402A of the Restatement states as follows:

> "The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it." Restatement (Second) of Torts § 402A, Comment *f*, at 350-51 (1965).

Comment *f* of the Restatement (Second) of Torts, however, does not provide a test for determining whether one is an occasional seller or engaged in the business. There is a paucity of case law in Illinois on the issue of whether one is an occasional seller. One court has explained the rationale of the occasional seller exception as follows:

> " ' "The basis for the rule [that the seller be engaged in the business of selling such a product] is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon the undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence." ' " *Goetz v. Avildsen Tool & Machines, Inc.*, 82 Ill. App. 3d 1054, 1062, 403 N.E.2d 555, 561-62 (1980), quoting *Daniels v. McKay Machine Co.*, 607 F.2d 771, 775 (D.C. Cir. 1979), quoting Restatement (Second) of Torts § 402A, Comment *f*, at 351.

See also *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1219 (5th Cir. 1985) (noting that the Restatement's examples of occasional sellers involve ordinary individuals who make isolated sales).

The trial court was incorrect in concluding, as a matter of law, that defendants were occasional sellers. Defendants are not ordinary individuals. The sale of these trucks cannot be characterized as an isolated transaction unrelated to the principal business of the seller.

This court has explained before that a defendant seeking summary judgment must satisfy its initial burden of production. *Wortel v. Somerset Industries, Inc.*, 331 Ill. App. 3d 895, 900, 770 N.E.2d 1211, 1214 (2002). Defendants failed to meet their initial burden here. The conclusory statement contained in Thomas Warren's affidavit that "neither [defendant] is engaged in the business of designing, manufacturing, distributing or selling tanker trucks" was insufficient to meet defendants' initial burden or to establish as a matter of law that defendants were not engaged in the business of selling the defective truck.

Although decided under Texas law, we agree with the analysis contained in *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985). The court there explained as follows:

"We conclude, however, that the affidavit did not discharge [defendant's] burden of showing that there are no genuine issues of material fact and that [defendant] is entitled to judgment as a matter of law. We note first that the affidavit's statement that [defendant] is not engaged in the business of selling sawmill trimmers is merely a conclusion which *could not shift the summary judgment burden to [plaintiff].* *** Whether a finding that one is engaged in the business of selling is labelled a conclusion of law, a mixed question of law and fact, or an ultimate fact, the general statement that [defendant] is not engaged in the business of selling trimmers, *without reference to the specific nature of sales activities,* [a factor which must be considered under Texas law,] is not competent summary judgment proof. We have long recognized that mere statements of conclusions of law or ultimate fact cannot shift the summary judgment burden to the nonmovant." *Galindo v. Precision American Corp.*, 754 F.2d at 1221.

Moreover, the plaintiff in *Galindo*, unlike plaintiff here, did not even counter the averments made in the defendant's affidavit. Thus, assuming *arguendo* that defendants had met their initial burden with this affidavit, the statements contained therein were sufficiently countered by the plaintiff, in his response, with the contradictory deposition testimony of Mr. Warren. He testified in his deposition that the defendant corporations, from time to time, sold used trucks to others when business concerns dictated the lack of need for the trucks. Mr. Warren testified that, in the 10-year period between 1988 and 1998, defendant Altom sold approximately eight trucks and defendant Warren possibly sold five. The income from these sales represented 1%

or less of defendants' incomes. The trial court decided that this testimony was sufficient, as a matter of law, to establish that defendants were not engaged in the business of selling tanker trucks. We disagree.

■ It is not necessary that a commercial seller be engaged exclusively or even primarily in selling the type of product that injured the plaintiff, provided that the sale of the product is more than occasional or casual. The sale of the tanker truck, A-2, was not an isolated transaction by an ordinary individual. As plaintiff notes, Mr. Warren's testimony also established that defendants: (1) did sell trucks, (2) derived company income from the sale of trucks such as the truck on which plaintiff was injured, (3) together sold 8 such trucks prior to plaintiff's accident, and (4) also sold approximately 25 tractors. We believe that a genuine issue of material fact existed as to whether defendants were engaged in the business of selling tanker trucks.

Nor can defendants characterize themselves as mere resellers of used items. The Illinois Supreme Court has held that a seller of used equipment may not be held liable under a theory of strict liability inasmuch as a seller is outside of the original producing and marketing chain. *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill. 2d 17, 19-20, 329 N.E.2d 785 (1975). In *Peterson*, however, the plaintiff had failed to allege either that the defects existed when the product left the control of the manufacturer or that the defects were created by the used car dealer. See *Court v. Grzelinski*, 72 Ill. 2d 141, 145, 379 N.E.2d 281, 282 (1978).

Because a genuine issue of material fact existed as to whether defendants were engaged in the business of selling tanker trucks, the trial court erred in granting summary judgment on plaintiff's strict liability count.

### B. The Circuit Court Erred When It Decided, as a Matter of Law, That Defendants Were Mere Installers

As noted earlier, plaintiff's strict liability count, in addition to defendants' roles as sellers, was based on their role as installers. In their motion for summary judgment, citing *Hinojasa v. Automatic Elevator Co.*, 92 Ill. App. 3d 351, 416 N.E.2d 45 (1980), defendants argued that strict liability does not apply against the installer of a product. In *Hinojasa*, the court held that a mere elevator installer was not sufficiently related to the elevator's distribution system and could not be characterized as putting an elevator into the stream of commerce. *Hinojasa*, 92 Ill. App. 3d at 353-54, 416 N.E.2d at 47-48. *Hinojasa* is inapposite because the defendant there did not assemble or sell

the allegedly defective product. We agree with plaintiff that defendants here cannot be characterized as mere installers.

It is undisputed that defendants built the trucks and sold the trucks to plaintiff's employer, a distinction noted by the *Hinojasa* court, which stated that "an installer is not involved in the sale of the product and therefore receives no profit from placing the defective product in the stream of commerce." *Hinojasa*, 92 Ill. App. 3d at 354, 416 N.E.2d at 48. Defendants are not mere installers of a defective component part in a product.

Plaintiff also cited *Prompt Air, Inc. v. Firewall Forward, Inc.*, 303 Ill. App. 3d 126, 707 N.E.2d 235 (1999), for the proposition that defendants were not mere installers. In *Prompt Air*, the defendant to whom the court applied the doctrine of strict liability contracted with Porsche-Galesburg Aircraft Sales (Porsche) to overhaul an airplane engine and subcontracted overhaul of *its turbocharger to another. Prompt Air*, 303 Ill. App. 3d at 127, 707 N.E.2d at 391. The defendant contended that, as a mere installer of the defective turbocharger, it was not subject to strict liability. The defendant also argued that it was not involved in the sale of a product at all, but instead in the rendition of a service.

■ After first accepting the general proposition that an "installer of a defective product who neither supplies the product nor creates the defect by improper installation is not subject to strict tort liability" (*Prompt Air*, 303 Ill. App. 3d at 130, 707 N.E.2d at 238), the court concluded that the defendant there was more than a mere installer. The court, noting that the defendant had sent the turbocharger to another to be overhauled, explained that it could be reasonably inferred that the defendant passed its costs for doing so onto Porsche. As the court explained: "One who sells, supplies, or distributes a defective product in the regular course of business *incident to* the rendition of a service may be held strictly liable in tort." (Emphasis added.) *Prompt Air*, 303 Ill. App. 3d at 130, 707 N.E.2d at 239. The court concluded that the defendant played an integral role in the distribution of the defective product because the turbocharger was supplied in the regular course of business incident to the defendant's rendition of a service—namely, the overhauling of engines, because the defendant procured and installed the defective component part. The circuit court misconstrued the holding in *Prompt Air*. We believe that defendants could be held strictly liable as installers of a defective product under the holding in *Prompt Air*. Nonetheless, in view of our conclusion that defendants were not mere installers and are subject to strict liability as sellers, we need not further address the applicability of *Prompt Air*.

## C. The Circuit Court Erred When It Decided, as a Matter of Law, That Defendants Were Not Manufacturers

Irrespective of the trial court's decision that defendants were not "sellers" and were not subject to liability as installers of a defective product, plaintiff alleged in his amended complaint that defendants were also manufacturers. The trial court failed to address plaintiff's argument that defendants were strictly liable as manufacturers of the defective tanker truck. The trial court apparently decided that defendants were not in the business of manufacturing tanker trucks based solely on Mr. Warren's statement to that effect in his affidavit.

Illinois courts have had the occasion to decide whether a party was a manufacturer. In *Dolese & Shephard Co. v. O'Connell*, 257 Ill. 43, 45, 100 N.E. 235, 236 (1912), in deciding whether a corporation was organized for purely manufacturing purposes and thus exempt from a tax, the Illinois Supreme Court defined the term "manufacturing" as follows: "Whenever labor is bestowed upon an article which results in its assuming a new form, possessing new qualities or new combinations, the process of manufacturing has taken place \*\*\*."

In *Transcon, Inc. v. Motion Inc.*, 14 Ill. App. 3d 61, 302 N.E.2d 135 (1973), the court, in considering whether a corporation was entitled to commissions on sales, also had occasion to consider the definition of "manufacturer." The court, citing *Dolese*, decided that the corporation was not a "manufacturer" because it only solicited orders for industrial conveyors and "bestowed no labor" upon the conveyors other than assisting in their installation and servicing them thereafter. *Transcon*, 14 Ill. App. 3d at 66, 302 N.E.2d at 138.

In *Schawk, Inc. v. Zehnder*, 326 Ill. App. 3d 752, 761 N.E.2d 192 (2001), another tax case, the court discussed the definition of "manufacturing" and noted that the relevant statute defined "manufacturing" as " 'the material staging and production of tangible personal property by procedures commonly regarded as manufacturing, processing, fabrication, or assembling which changes some existing material into new shapes, new qualities, or new combinations.' " *Schawk*, 326 Ill. App. 3d at 755, 761 N.E.2d at 195, quoting 35 ILCS 5/201(e)(3) (West 1998). The court also further noted as follows:

> "The Oxford English Dictionary defines 'manufacture' as follows: '1. \*\*\* To work up (material) into form suitable for use. \*\*\* 2. To make or fabricate from material; to produce by labour (now esp. on a large scale).' [Citation.] The American Heritage Dictionary, defines 'manufacture' as '1. a. To make or process (a raw material) into a finished product, esp. by means of a large-scale industrial operation. b. To make or process (a product) \*\*\*. 2. To create, produce or turn out in a mechanical manner \*\*\*. 3. \*\*\* To make or

process goods, esp. in large quantities and by means of industrial machines.' [Citation.]." *Schawk*, 326 Ill. App. 3d at 755-56, 761 N.E.2d at 195.

■ Plaintiff asserts that the evidence that was introduced at trial conclusively established that defendants manufactured, built or otherwise constructed A-2 and A-3. We find pertinent to the circumstances of the instant case an argument put forth by the plaintiff in *Hinojasa*. The *Hinojasa* plaintiff cited *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182 (1965), for the general proposition that the *assembler* of parts may be liable in tort for a defective product. Defendants here are *assemblers* of parts subject to liability in tort for a defective product assembled. *Suvada*, 32 Ill. 2d at 617, 210 N.E.2d at 185. By assembling the parts, a task that took 200 hours, it could be concluded, as a matter of law, that defendants are manufacturers. Defendants manufactured A-2 and A-3 and section 402(A) applies to manufacturers. At the very least, at the summary judgment stage, a genuine issue of material fact existed as to whether defendants were manufacturers. The trial court erred in granting summary judgment to defendants on plaintiff's strict liability count.

In view of our conclusion, we need not address plaintiff's additional argument, raised on appeal, that section 2—621(a) of the Code of Civil Procedure (735 ILCS 5/2—621(a) (West 2000)) precludes summary judgment in defendants' favor. Section 2—621 governs all product liability actions and provides the methods by which a nonmanufacturing defendant may be dismissed.[4]

Plaintiff argued in his brief that he is entitled to a new trial on the merits on his strict liability count. During oral argument, plaintiff clarified that he was not seeking a new trial on all issues. Although plaintiff contended that, had the jury also been instructed on strict liability, the apportionment of fault may have been different, a second trial on strict liability only could not remedy that situation and could only result in double recovery. Here, the case went to the jury under a negligence theory and the jury was instructed on the duties owed by defendants. Because the jury decided that defendants breached their duties, and further found that the breach was a proximate cause of plaintiff's injuries and awarded plaintiff damages, we reject plaintiff's argument that a new trial is in order on the strict liability theory. A

---

[4]Section 2—621(a) provides as follows: "In any product liability action based on any theory or doctrine commenced or maintained against a defendant or defendants other than the manufacturer, that party shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage." 735 ILCS 5/2—621(a) (West 2000).

plaintiff is entitled to one recovery only for his injuries, regardless of the number of theories advanced. *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 558, 411 N.E.2d 217, 222 (1980).

## II. Whether the Trial Court Correctly Allocated Fault Under Section 2—1117 of the Code of Civil Procedure

Plaintiff argues that, in the apportionment of fault under section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1994)), Altom and Warren should have been found jointly liable to Carollo, rather than severally liable. We disagree.

■ At the time of plaintiff's injury, section 2—1117 provided, in relevant part, as follows:

> "[I]n actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. *Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant who could have been sued by the plaintiff, shall be severally liable for all other damages.* Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants who could have been sued by the plaintiff, shall be jointly and severally liable for all other damages." (Emphasis added.) 735 ILCS 5/2—1117 (West 1994).

Thus, section 2—1117 makes a tortfeasor only severally liable when its percentage of fault for plaintiff's injuries is less than 25% of the total fault. The jury found Altom and Warren each individually less than 25% negligent. Plaintiff now contends, however, that his employer, Premier, should not have been included in the allocation of fault. Plaintiff relies on the reasoning in *Lilly v. Marcal Rope & Rigging, Inc.*, 289 Ill. App. 3d 1105, 682 N.E.2d 481 (1997). The *Lilly* court held that under section 2—1117 of the Code of Civil Procedure, an employer was not a " 'third party defendant who could have been sued by the plaintiff' " and thus could not be considered in the determination of the defendants' relative fault. *Lilly*, 289 Ill. App. 3d at 1117, 682 N.E.2d at 489, quoting 735 ILCS 5/2—1117 (West 1994). Plaintiff's extensive reliance on the analysis in *Lilly* is unpersuasive. *Lilly* was abrogated by the Illinois Supreme Court in *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 783 N.E.2d 1024 (2002). We agree with defendants that the Illinois Supreme Court case of *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 74, 783 N.E.2d 1024, 1031 (2002), is dispositive.

■ As the *Unzicker* court stated, "The clear legislative intent behind section 2—1117 is that minimally responsible defendants should not have to pay entire damage awards. The legislature set the line of minimal responsibility at less than 25%." *Unzicker*, 203 Ill. 2d at 78, 783 N.E.2d at 1033. The *Unzicker* court concluded that it would not be in accord with this legislative intent to ignore the party who was found to be 99% responsible for the plaintiff's injuries—the plaintiff's employer—and require the party found 1% responsible to pay all of the nonmedical damages. *Unzicker*, 203 Ill. 2d at 79, 783 N.E.2d at 1033-34. Thus, the *Unzicker* court held that plaintiff's employer could be "considered in the division of fault under section 2—1117." *Unzicker*, 203 Ill. 2d at 96, 783 N.E.2d at 1043. In reaching its decision, the *Unzicker* court specifically overruled *Lilly v. Marcal Rope & Rigging, Inc.*, 289 Ill. App. 3d 1105, 682 N.E.2d 481 (1997), which held to the contrary. Thus, the trial court here correctly included Premier in the allocation of fault under section 2—1117 of the Code of Civil Procedure.

### III. *Unzicker* Is Not Factually Distinguishable

Plaintiff concedes that the *Unzicker* court concluded that "a plaintiff's employer who is a third-party defendant is a party who 'could have been sued by the plaintiff.'" *Unzicker*, 203 Ill. 2d at 77, 783 N.E.2d at 1033. Plaintiff contends, however, that *Unzicker* is inapplicable because the employer there was 99% at fault, while Premier was only 52% at fault. The *Unzicker* court made no distinction between an employer that was 99% at fault and an employer that was 85% or 75% or 52% at fault. The jury here determined that Premier, similar to plaintiff's employer in *Unzicker*, was primarily responsible for plaintiff's injuries. Although the *Unzicker* court considered the fact that plaintiff's employer was 99% responsible for plaintiff's injuries, the unequivocal holding was that, in the division of fault under section 2—1117, a third-party defendant *employer* should be included. Plaintiff's attempt to distinguish *Unzicker* fails.

We decline plaintiff's invitation to find *Unzicker* distinguishable based on the fact that the employer in *Unzicker* was found to be 99% at fault and the other defendant was found to be 1% at fault; whereas here Premier was found to be 52% and defendants Warren and Altom were found to be 15% and 18% at fault, respectively. As defendants correctly note, the *Unzicker* court repeatedly emphasized that the intent of section 2—1117 is that minimally responsible defendants— that is those less than 25% at fault—shall not pay entire judgments. *Unzicker*, 203 Ill. 2d at 78-79, 84, 94, 783 N.E.2d at 1033-34, 1037, 1042.

#### IV. The Amendment to Section 2—1117 Is Not Retroactive

As defendants note in their brief, in response to the *Unzicker* decision, the newly elected legislature amended section 2—1117 by specifically providing that a plaintiff's employer should *not* be considered in the allocation of total fault. Pub. Act 93—10, eff. June 4, 2003. This statutory amendment is a substantive change. We agree with the defendants, for the reasons stated in their brief and their sur-reply brief, that this statutory amendment is not retroactive and does not apply to the instant case. Thus, the trial court correctly included Premier in allocating fault for the purposes of section 2—1117, making defendants Warren and Altom each only severally liable for their proportionate share of plaintiff's nonmedical damages.

#### V. Plaintiff's "In Concert" Theory of Liability Fails

Posttrial, plaintiff attempted to take this case out from under section 2—1117 by raising a new theory that defendants acted in concert to cause plaintiff's indivisible injuries. We agree with defendants' argument that plaintiff never pleaded, proceeded on or proved an in-concert liability action against defendants.

■■ Before addressing plaintiff's in-concert argument, we note that plaintiff has intertwined with this argument a contention that section 2—1117 is inapplicable because his injuries are indivisible. There is no authority for plaintiff's argument. In *Woods v. Cole*, 181 Ill. 2d 512, 518, 693 N.E.2d 333 (1998), the Illinois Supreme Court stated: "In general, the common law doctrine of joint and several liability provides that when two or more individuals tortiously contribute to the same, indivisible injury, each individual may be held jointly and severally liable for the entire injury." As defendants correctly note, contrary to plaintiff's contention, *Woods* did not hold that section 2—1117 is inapplicable *whenever* a plaintiff suffers an indivisible injury. Rather, *Woods* created a judicial exception to section 2—1117 for concerted action. Thus, the defendants must be acting "in concert." Plaintiff has misstated the law and the holding of *Woods*. Moreover, if we accepted plaintiff's argument, then section 2—1117 could never apply when there was more than one tortfeasor and plaintiff suffered an indivisible injury. Indivisibility of injury is different from divisibility/apportionment of fault.

■■ Where there is concert of action between defendants, one tortfeasor is held legally responsible for the tortious actions of another. *Woods v. Cole*, 181 Ill. 2d at 519, 693 N.E.2d at 337. Section 876 of the Restatement (Second) of Torts specifies three forms of in-concert liability and provides as follows:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979).

This section of the Restatement has been adopted in Illinois. See *Umble v. Sandy McKie & Sons, Inc.*, 294 Ill. App. 3d 449, 451, 690 N.E.2d 157, 158 (1998) (affirming dismissal of plaintiff's complaint for failing to state a cause of action for in-concert liability); see also *Fortae v. Holland*, 334 Ill. App. 3d 705, 716, 778 N.E.2d 159, 168 (2002) ("Although Illinois courts have not fully colored in the law regarding in-concert liability, our courts have stated that section 876 of the Restatement (Second) of Torts provides an accurate definition").

 Plaintiff now asserts that defendants *cannot* contest the fact that they both acted in concert when they built and sold the two tanker trucks (A-2 and A-3) that caused plaintiff's injuries. He argues that there can be no other logical conclusion than that the two defendants were one in the same. He claims that Mr. Thomas Warren, the owner and president of both defendant companies, "admitted as much at trial" when he testified that his "companies sold both A-2 and A-3 to Premier." He also asserts that defendants never attempted to distinguish their individual actions or character during the trial. He also claims that Mr. Warren made another judicial admission in his response to an interrogatory regarding the assembly of A-2 when he stated: "*We* [Altom and Warren] only transferred a holding tank and related accessories onto truck [*sic*] from another truck." (Emphasis added.)

As to plaintiff's in-concert theory of liability, the trial court specifically found that the case was not tried on the theory that defendants acted in concert. Neither plaintiff's original nor amended complaint contained allegations of in-concert liability. Plaintiff proffered no evidence and made no arguments during trial on in-concert liability. The issues instruction tendered by plaintiff, and given by the court, made general claims of negligence against each defendant—and no claims of in-concert liability. Plaintiff tendered no special interrogatory on in-concert liability. We reject plaintiff's contentions that his various references to "both" defendants translate into a conclusion that he tried his case on an "in-concert" theory. We agree with the trial court's decision that plaintiff did not try his case on an in-concert

liability theory and cannot invoke it posttrial in an attempt to escape the effect of section 2—1117.

Moreover, as defendants point out, plaintiff's assertions of fact belie the evidence in the record. Contrary to plaintiff's representations, defendants did not build the tanker trucks together. The uncontroverted trial evidence established that it was Altom employees only who assembled the tanker trucks. Plaintiff presented no evidence that either defendant did a tortious act in concert with the other or pursuant to a common design with the other. Plaintiff adduced no evidence that defendants acted in concert in *creating* the alleged "defects" on the secondhand products. Plaintiff presented no evidence that either defendant knew that the other's conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so as to conduct itself or to accomplish a tortious result. Plaintiff adduced no evidence that the two defendants, knowing of each others' wrongdoing, undertook to participate therein.

Plaintiff chose to sue the two corporations separately, alleging negligence against each one separately. The corporations are two distinct entities with two different purposes. The evidence showed that Altom was the company that previously used the tank on A-2, and that employees of Altom (and not Warren) assembled A-2 and A-3. The liability of the tortfeasors here could be and was legally apportioned. The court instructed the jury that it need not find both defendants liable. The issues instruction that plaintiff tendered, and the trial court gave, provided that the jury was to consider the allegations of negligence "as to each defendant separately." The instruction further provided: "If you find *** that each of these propositions has been proved as to one or both of the defendants, then that defendant or those defendants are liable and your verdict should be for the plaintiff and against that defendant or those defendants." The jury apportioned liability amongst all the tortfeasors, and, as between Altom and Warren, assigned a greater percentage of fault to Altom, which assembled the trucks. The trial court correctly denied plaintiff's posttrial request to hold defendants liable under an in-concert theory.

## DEFENDANTS' CROSS-APPEAL

■ We now address the issue raised in defendants' cross-appeal, as well as their posttrial motion. Defendants contend that they are entitled to a judgment notwithstanding the verdict.

A judgment notwithstanding the verdict should be entered only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 523-24 (1967). In

ruling on a judgment notwithstanding the verdict, a court does not weigh the evidence or consider the credibility of the witnesses; instead, the court only considers the evidence and any inferences therefrom in the light most favorable to the opposing party. *Board of Trustees of Community College District No. 508 v. Coopers & Lybrand*, 208 Ill. 2d 259, 274, 803 N.E.2d 460, 469 (2003).

Defendants first argue that they had no duty towards plaintiff and could therefore not be liable under a negligence theory. Relying on *Cozzi v. North Palos Elementary School District No. 117*, 232 Ill. App. 3d 379, 597 N.E.2d 683 (1992), defendants contend that "a defendant who has no duty in strict liability has no duty in negligence." In Illinois, because a *manufacturer* is under a nondelegable duty to produce a product that is reasonably safe, some courts have stated that the manufacturer's duty is the same in both negligence and strict products liability actions. See, *e.g., Phillips v. United States Waco Corp.*, 163 Ill. App. 3d 410, 417, 516 N.E.2d 670, 674 (1987).

We agree with plaintiff that claims for strict liability and negligence are distinct causes of action with separate elements. See *Freeman v. White Way Sign & Maintenance Co.*, 82 Ill. App. 3d 884, 890-91, 403 N.E.2d 495, 500 (1980); see also Restatement (Second) of Torts § 402(A), Comment *a*, at 348 (1965) ("The rule [of strict liability] stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved"). Nonetheless, because we have decided that the circuit court improvidently granted summary judgment to defendants on plaintiff's strict liability count, defendants' arguments fail.

We hold, as a matter of law, that defendants had a duty to build a truck that was reasonably safe and had a duty not to sell a truck that had a defect. Thus, the trial court correctly denied defendants' motion for judgment notwithstanding the verdict that was premised upon the argument that defendants owed no duty to plaintiff. Although an earlier trial judge incorrectly granted summary judgment on count I (strict liability) of plaintiff's second amended complaint, the jury's verdict in favor of plaintiff on negligence and the judgment entered on that verdict has rendered the issue moot. Plaintiff has not appealed from that judgment and is not entitled to a new trial on that count alone. Finally, we affirm the trial court's judgment order entered December 30, 2002, which modified the prior judgment order and entered judgment in favor of plaintiff in the amount of $430,960.

Affirmed.

O'BRIEN and NEVILLE, JJ., concur.