# In the

# United States Court of Appeals

## For the Seventh Circuit

―――――――

Nos. 04-3411 & 04-3561

KEMPNER MOBILE ELECTRONICS,
INCORPORATED,

*Plaintiff-Appellant*,
*Cross-Appellee*,

*v.*

SOUTHWESTERN BELL MOBILE SYSTEMS,
doing business as Cingular Wireless,

*Defendant-Appellee*,
*Cross-Appellant*.

―――――――

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 5403—**Sidney I. Schenkier**, *Magistrate Judge*.

―――――――

ARGUED FEBRUARY 8, 2005—DECIDED NOVEMBER 3, 2005

―――――――


Before RIPPLE, EVANS, and WILLIAMS *Circuit Judges*.

WILLIAMS, *Circuit Judge*. This continuing litigation has
spawned a preliminary injunction hearing, two trials
and now this appeal of several rulings in Cingular's favor.
We affirm all the rulings except that we find that judgment
as a matter of law should have been entered in Cingular's
favor on Kempner's tortious interference with prospective
economic advantage claim because the evidence in this case
reveals that Cingular did nothing more to "interfere" with

Kempner than compete for business in the cellular phone market. We, therefore, reverse the district court's denial of Cingular's motion for judgment as a matter of law on this claim. We affirm all the remaining rulings of the district court.

## I. BACKGROUND

This diversity lawsuit arises out of disputes between Kempner Mobile Electronics, Inc. ("Kempner"), an Illinois corporation with its principal place of business in Illinois, and Southwestern Bell Mobile Systems, d/b/a as Cingular Wireless ("Cingular"), a Delaware limited liability corporation with its principal place of business in Georgia. Kempner engaged in the marketing and sale of, among other things, cellular telephone products and services. Cingular was involved in the development, establishment and sale of cellular telephones and services in various parts of the United States, including the Chicago metropolitan area. In late 1999, Kempner and Cingular entered into an Authorized Agency Agreement ("1999 Agreement"), which was the last of several written agreements entered into by the parties dating back to the beginning of their relationship in 1989.

The 1999 Agreement expressly states that the relationship between the parties was not a "general agency, joint venture, partnership, employment relationship or franchise." The 1999 Agreement defines "Authorized Services" as the services offered by Cingular that Kempner was allowed to sell under the 1999 Agreement. Under the 1999 Agreement, Kempner was to sell only cellular radio service ("CRS"), not commercial radio services ("CMRS"). In addition, Kempner could also sell paging services or other customer premises equipment ("CPE") offered by companies other than Cingular. And Kempner was authorized to sell or lease CPE, the cellular telephones or other related hardware necessary for the customer to use the Cingular

cellular services marketed by Kempner. The 1999 Agreement authorized Kempner to sell these products and services in a specific "Area," the six-county Chicago metropolitan area, defining "Subscribers" as customers of the Authorized Services provided by Cingular; each telephone number assigned to a customer of Authorized Services was counted as a separate "Subscriber."

Under the 1999 Agreement, Kempner was a "non-exclusive authorized agent" for Cingular, in that Cingular reserved the right to market its own cellular services and CPE "in the same geographical areas served by [Kempner], whether through [Cingular's] own representatives or through others including, but not limited to, other authorized agents, retailers, resellers and distributors." However, the 1999 Agreement prohibited Kempner from acting as a representative or agent of any other reseller or provider of cellular services in the six-county Chicago metropolitan area, or to attempt to persuade Subscribers of Cingular's services to obtain cellular service from another provider.

Cingular retained sole authority to establish the rates, terms and conditions of the sale by Kempner of Authorized Services. The 1999 Agreement contains no provision that specifies how the rates, terms and conditions for the sale of services offered by Kempner would compare to that offered by other outside agencies, or to company stores or in-house sales outlets. The persons to whom Kempner sold cellular service on behalf of Cingular became customers of Cingular. On the other hand, individuals who bought from Kempner CPE, but not Cingular cellular services became customers of Kempner, and Kempner had the authority to set the price at which it would sell CPE.

Under the 1999 Agreement, Kempner was compensated for sales on a commission basis. Kempner received a commission on both pre-paid and post-paid contracts based on a percentage of the initial payments. With respect to

post-paid contracts, Kempner also received a residual commission, based on the payments made by the customer on their cellular contract going forward. The 1999 Agreement also provided that Cingular could withhold an offset against this commission stream for amounts past due and owing from Kempner to Cingular.

In addition to requiring that Cingular pay Kempner commissions for sales made, the 1999 Agreement required Cingular to provide Kempner with promotional literature, sales brochures and information for preparation of catalogs, advertising and other promotional activities, and a reasonable amount of sales training. The 1999 Agreement also allowed Kempner to use certain Cingular marks in marketing Cingular's services.

The 1999 Agreement provided that for a period of one year after its termination or expiration, Kempner could not engage in any of the following acts:

> (1) directly or indirectly, induce, influence or suggest to any Subscriber of CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;

> (2) directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;

> (3) under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other authorized service on behalf of any

competing reseller or provider of such service in the Area;

(4) directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of [Kempner or Cingular] in any manner in connection with such other entities' sale of CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, . . . and [Kempner] specifically agrees not to transfer, assign, authorize or consent to the transfer of [a Kempner] telephone number to any other person, firm or other entity upon expiration or termination of this Agreement.

The 1999 Agreement states that the consideration provided by Cingular for these non-compete provisions was Cingular's grant to Kempner "of the right to use the Marks, the right to advertise affiliation with [Cingular] as an authorized agent of [Cingular] and great value of the goodwill associated with [Kempner's] ability to use the Marks . . . and . . . the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by [Cingular] to [Kempner] from time to time."

On May 6, 2002, Kempner filed an eleven-count complaint against Cingular seeking damages relating to the 1999 Agreement. Kempner asserted various claims for breach of contract, common law tort and statutory tort, arguing that it should prevail in its suit because (1) the restrictive provisions in the 1999 Agreement were unenforceable as Cingular had allegedly breached the 1999 Agreement, (2) Cingular made misrepresentations to Kempner and (3) Cingular wrongfully contacted Kempner's customers. In addition, Kempner sought a declaration that Kempner was not bound by any of the terms of the 1999 Agreement, including its exclusivity and non-compete provisions, which, among other things, prohibited Kempner from selling

competitive services. Kempner also sought an injunction to prevent enforcement of the exclusivity and non-compete provisions of the Agreement and to require Cingular to maintain Kempner as an authorized agent but excusing Kempner from remaining exclusive.

On August 20, 2002, after removing the action to federal court, Cingular filed a cross-motion for preliminary injunction to enforce the exclusivity and non-compete provisions of the Agreement and preclude Kempner from selling wireless services on behalf of competing carriers. The court held a preliminary injunction hearing on the issues and held that: (a) the exclusivity provision of the Agreement was enforceable and that Cingular had properly terminated Kempner's agency for violation of the exclusive agency provision; (b) the post-termination, non-compete provision was enforceable with respect to Kempner's sales to existing Cingular customers activated by Kempner; and (c) the non-compete provision was not enforceable to preclude Kempner from selling to non- Cingular customers on behalf of carriers competing with Cingular.

As a result of voluntarily withdrawing some claims and the district court's grant of summary judgment in favor of Cingular on other claims, for trial Kempner was left with two claims of breach contract, as well as a claims for common-law fraud and tortious interference with economic advantage. In addition, Cingular's two counterclaims for breach of contract remained. On November 17, 2003, the first day of trial, Cingular presented a motion to bar Kempner's expert, which the district court denied without prejudice. With the consent of the parties, the trial was bifurcated on issues of liability and damages.

At the close of Kempner's case in chief on liability, Cingular moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on all Kempner's claims. The court denied the motion in its entirety.

Cingular did not renew its Rule 50(a) motion at the close of its case in chief, or at any other time before submission of the case to the jury. On November 21, 2003, the case was submitted to the jury, and the jury returned verdicts in favor of Kempner and against Cingular on all four of Kempner's claims and on both of Cingular's counterclaims. After trial, Cingular filed a motion for judgment as a matter of law, or in the alternative, for a new trial on all claims. Following briefs and oral argument, the district court granted Cingular a new trial on Kempner's tortious interference claim and on Cingular's equipment receivable counterclaim.

In preparation for the damages phase of the first trial, Cingular renewed its motion to bar Kempner's evidence concerning fraud damages, and Kempner filed a memorandum in support of its request for punitive damages. The district court granted Cingular's motion to bar expert testimony on the fraud claim and granted Kempner's motion to submit evidence for award on punitive damages.

On July 22, 2004, at the pre-trial conference before the second liability trial, the district court precluded Kempner from offering evidence or argument that Kempner was not liable for paying amounts due on Cingular's equipment receivables counterclaim because of a claimed offset from the 1999 Agreement. As a consequence, the parties stipulated to liability and damages on the equipment receivables claim.

The second trial on liability regarding Kempner's claims of tortious interference began on August 2, 2004, and at the close of Kempner's presentation of evidence, the court denied Cingular's motion for judgment as a matter of law on the tortious interference claim and on Kempner's claim for punitive damages. At the close of all evidence, Cingular renewed its motion for judgment as a matter of law. This time the court granted the motion as to punitive damages

but again denied the motion as to tortious interference. The jury returned a verdict in favor of Kempner. Thereafter, the parties stipulated to the actual damages to be awarded on each of the remaining claims, eliminating the need for any further damages proceedings. On August 17, 2004, the court entered judgment on all the parties' respective claims.

## II.  ANALYSIS

A.  The Trial Court Properly Excluded Kempner's Evidence of Fraud Damages.

In its fraud claim, Kempner claimed that in May 2001, Cingular represented to Kempner that Kempner would receive the same equipment and service pricing as was available to Cingular's internal distribution channels. Kempner argues that these representations were false, and that Kempner decided not to terminate its relationship with Cingular and accept an attractive offer to become a master agent for Nextel in justifiable reliance on Cingular's representations. Kempner claims that by the time it fully recognized that Cingular's representations were indeed false, the offer with Nextel was no longer available. A jury returned a verdict in favor of Kempner and against Cingular on this fraud claim.

Following the jury verdict, but before proceeding on damages, the court granted Cingular's motion to bar Kempner's expert testimony on fraud damages. In granting Cingular's motion, the court held that Kempner's evidence of damages failed to match the theory of fraud upon which Kempner had prevailed at trial. The court found that Kempner's expert assumed that Kempner would have been able to sell for both Nextel and Cingular simultaneously, while the theory that Kempner presented at trial was that Kempner would have sold for Nextel, and not for Cingular,

but for misrepresentations made by Cingular. Furthermore, the court noted that the damages calculation also included several months of profit that preceded the alleged fraud, which would be unrecoverable under any set of facts.

We review *de novo* whether the district court applied the appropriate legal standard in making its decision to admit or exclude expert testimony, and we review for abuse of discretion the district court's choice of factors to include within that framework as well as its ultimate conclusions regarding the admissibility of expert testimony. *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). Expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" FED. R. EVID. 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) laid the foundation for this rule, which was designed to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Parra*, 402 F.3d at 758 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). A court abuses its discretion when it commits "a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor [in admitting or excluding expert testimony]." *Smith*, 215 F.3d at 717 (quoting *Powell v. AT&T Comm., Inc.*, 938 F.2d 823, 825 (7th Cir. 1991)).

On appeal, Kempner never addresses the disconnect between its damages evidence and the theory of liability it prevailed upon at trial. Instead, Kempner concedes that its damages evidence assumed that the exclusivity provision of the 1999 Agreement was unenforceable such that Kempner would have been able to sell both Nextel and Cingular services. (Appellant Opening Br. at 23.) Even if evidence regarding whether the restrictive covenant was enforceable had been allowed to go trial, Kempner's damages evidence could not be offered as a basis for its

theory of fraud because Kempner's damages evidence failed to separate profits Kempner would have gained from sales of Nextel products and services from profits gained from sales of Cingular products and services. Kempner admits that the "[d]amages [evidence was] not individually calculated on each theory [of fraud presented at trial], as the damages model reflect[ed] overall profitability levels." (Appellant's Opening Br. at 20.) We agree with the decision of the district court that the expert testimony submitted by Kempner would not assist the trier of fact to determine the issue of fraud damages in this case. We find, therefore, that the district court properly applied Federal Rule of Evidence 702 to exclude the damages evidence submitted by Kempner's expert as irrelevant and inapplicable to its theory of liability.

In the alternative, Kempner argues that it should have been allowed to amend its damage disclosures. In excluding Kempner's theory of damages, the court found that Kempner's failure to disclose relevant expert testimony was neither justified nor harmless. The court explained, on the record, that after its ruling on summary judgment only a single fraud claim remained for Kempner to pursue at trial, and that Kempner had ample opportunity to submit damages calculations that matched the remaining theory, but Kempner failed to do so. Instead, Kempner submitted a modified damages report that did not match the remaining fraud theory of the case. In explaining that Kempner's time to amend included the time between the court's ruling on summary judgment and trial, the court reasoned that not only did Kempner not take advantage of the time available and allotted to amend its disclosure, but Kempner never requested to amend the expert report or to continue the trial to prepare a new expert report.

In addition, the district court found Kempner's failure to amend was not harmless as Cingular would be prejudiced

if the court allowed Kempner, after trial and after a jury verdict, to submit a new damages report. The court determined that if it would have allowed Kempner to amend, then its allowance would have a prolonged delay in the already protracted proceedings requiring additional discovery and increased costs. Moreover, the court found that allowing Kempner to offer a different damages theory at such a late stage in the game after a liability finding would have unfairly changed the entire landscape of the case to the detriment of Cingular. We agree with the district court's reasoning and find that the district court did not abuse its discretion in denying Kempner the opportunity to amend its damages report.

Finally, Kempner argues that district court erred by not letting Kempner at least submit out-of-pocket damages in lieu of actual damages. The district court denied Kempner's request to pursue out-of-pocket damages because Kempner failed to identify any out-of-pocket cost damages attributable to fraud in its final pretrial order. The district court found Kempner's omission unjustifiable and prohibited Kempner from proceeding with testimony on the issue at trial. Based on these findings and our review of the record, we find that the district court did not abuse its discretion in denying Kempner's request to offer evidence not disclosed in its final pretrial order.

B.  The District Court Did Not Abuse Its Discretion in
    Refusing to Permit Kempner to Challenge the Exclusiv-
    ity Provision of the Contract at Trial.

During the preliminary injunction hearing, Kempner
presented evidence regarding Cingular's lax enforcement of
the exclusivity provisions of its contract. The district court
concluded that this evidence did not demonstrate a likeli-
hood of success on the issue, but left open the possibility
that the exclusivity provision could be deemed unenforce-
able at a trial on the merits. Before trial, Cingular filed a
motion *in limine* to preclude evidence at trial challenging
the exclusivity provision. At the hearing on the motion to
exclude, the district court asked Kempner what additional
evidence it possessed that was not presented at the prelimi-
nary injunction hearing that would bolster its claims at
trial. Kempner proffered no additional evidence, which led
the district court to grant Cingular's motion, and Kempner
argues that the district court erred. We disagree.

We review the district court's rulings on motions *in limine*
for an abuse of discretion. *Heft v. Moore*, 351 F.3d 278, 284
(7th Cir. 2003) (citation omitted). Kempner's arguments are
inconsistent. On one hand, Kempner argues that Cingular
forced Kempner to forego a lucrative contract with Nextel
by, in part, enforcing its exclusivity provision. On the other
hand, Kempner argues that Cingular should not be allowed
to enforce its exclusivity provision so the Kempner can sign
with Nextel. We find that the court did not abuse its
discretion by excluding this evidence because Kempner
failed to proffer additional evidence to bolster its claims.


C.  The District Court Properly Refused to Permit Kempner
    to Recover Punitive Damages.

In a diversity action such as this one, state law gov-
erns the factors a jury may consider in determining the
amount of punitive damages, while federal law governs the

district court's review of the jury award and appellate review of the district court's decision. *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 735 (7th Cir. 2004). Under Illinois law, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law and our review is therefore *de novo*. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 946 (7th Cir. 2002) (interpreting Illinois law) (quotations and citations omitted).

In general, the Illinois Supreme Court does not favor punitive damages and such damages may only be awarded where torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. *Id*. In refusing to submit the question of punitive damages to the jury, the court made the following findings based on the evidence of Kempner's claim of tortious interference adduced at the second trial: that Cingular (1) did not act with malice, or with the intention of injuring Kempner, (2) simply advanced its own interests in contacting its own customers subscribed through Kempner, (3) never made improper or untrue statements about Kempner to the customers at issue, (4) did not engage in a pattern of tortious conduct, and (5) did not attempt to conceal tortious conduct.

On appeal, Kempner can point to no evidence of fraud, aggravation, malice, or wanton disregard on the part of Cingular in contacting its customers. Instead, Kempner argues that the district court failed to consider the interrelationship between Cingular's misrepresentations to Kempner and its tortious interference with Kempner's economic advantage. We find no evidence of any interrelationship between the two. Although we acknowledge the

evidence presented at trial of misrepresentations between Cingular and Kempner, we find no evidence of a repeated pattern of misrepresentations in connection with the alleged tortious interference, of any misrepresentations concealed over extended periods of time or any type of outrageous conduct that would justify a jury awarding punitive damages. Therefore, the district court correctly determined that the facts of this case do not justify the imposition of punitive damages.

D. The District Court Properly Refused to Order an Equitable Accounting.

We review the district court's denial of an equitable remedy for abuse of discretion. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 544-45 (7th Cir. 2003) (citations omitted). To state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law. *Mann v. Kemper Fin. Cos.*, 618 N.E.2d 317, 327 (Ill. App. Ct. 1992); *see also Zell v. Jacoby-Bender, Inc.*, 542 F.2d 34, 36 (7th Cir. 1976) (finding that the necessary prerequisite to maintain a suit for an equitable accounting, like all other equitable remedies, is the absence of an adequate remedy at law). In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature. *Mann*, 618 N.E.2d at 327.

In this case, Kempner has not alleged that it is without an adequate remedy at law. Moreover, Kempner never pled a claim for accounting, but instead waited until receiving a verdict on liability to request an accounting. We find that this case is nothing more than a garden-variety contract dispute. Indeed, damages in this case are not speculative, and the amount of damages is neither

difficult nor impossible to measure. Furthermore, all of the accounting information pertinent to Kempner's claims could and should have been revealed through discovery, and there is no showing that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them. *See Zell*, 542 F.2d at 36. As a result, we find that the district court did not abuse its discretion in refusing to allow Kempner an accounting.

E.   The District Court Properly Granted Cingular's Motion for a New Trial on Its Counterclaim.

At the first trial, Cingular offered evidence that it shipped cellular equipment to Kempner under a contract separate from the 1999 Agreement, and that Kempner kept and used the equipment, but did not pay for it. Over Cingular's objections, the district court instructed the jury that in order to establish this counterclaim, Cingular would have to prove, among other things, that it "substantially performed all obligations required of it under the agreement." After the jury verdict against Cingular on this claim, Cingular moved for a new trial on its counterclaim, arguing that the district court confused the jury by combining the two separate agreements at issue: the 1999 Agreement which governed Cingular's obligation to pay commissions, and the separate agreement between Kempner and Cingular for the sale of equipment. The district court agreed, finding that the jury instruction improperly recast the two agreements into one which confused the jury, and granted a new trial on Cingular's equipment receivable counterclaim. The court also ruled that Kempner would be prohibited from offering evidence in the second trial that it was not liable under the equipment contract as the result of outstanding commissions due to it under the 1999 Agreement.

Appellate review of a district court's order for a new trial is limited. Because the trial judge is uniquely sit-

uated to rule on such a motion, the district court has great discretion in determining whether to grant a new trial. *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). We, therefore, review a district court's decision to grant a new trial for a clear abuse of discretion. *Id.* On appeal, Kempner does not address in any fashion the confusing jury instruction given to the jury. Instead, Kempner implicitly concedes the court erred in giving the shortened jury instruction and focuses its argument on whether the court erred in denying Kempner the opportunity to introduce evidence establishing that payment under the equipment receivable contract was not due until Cingular accounted to Kempner for unpaid commissions. Therefore, we find that the district court's grant of a new trial was not a clear abuse of discretion, and the limits the district court put on the evidence to be presented at the second trial was not an abuse of discretion.

F.  The District Court Erred by Not Entering Judgment as a Matter of Law in Favor of Cingular on Kempner's Tortious Interference Claim.

The elements of a claim of tortious interference with prospective business or economic advantage are: (1) plaintiff's reasonable expectation of entering into a valid business relationship, (2) defendant's knowledge of plaintiff's expectancy, (3) purposeful or intentional interference by defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damages to plaintiff resulting from the interference. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003).

In *Cromeens*, authorized dealers of Volvo claimed that Volvo tortiously interfered with its prospective business advantage where Volvo encouraged customers to buy products from Volvo dealers rather than from the

independently-owned authorized dealers. The court found that Volvo used truthful statements to the customers to encourage their switch and held that the plaintiff's claim of interference failed because there is no liability for interference with a prospective contractual relation on the part of one who merely gives truthful information to another and does nothing more than compete with a competitor for business. *Cromeens*, 349 F.3d at 399 (citing *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (Ill. 1995)).

In this case, Kempner argues that Cingular interfered with Kempner's relationship with Kempner's customers for the sale of cellular telephone equipment by improperly contacting Kempner's customers and soliciting them to purchase equipment from Cingular directly. Kempner argues that these contacted third parties were long-standing customers of Kempner, and as a result, Kempner had a reasonable business expectation of entering into future contractual relationships with these customers. We disagree.

The evidence in this case establishes that the third parties contacted by Cingular were not Kempner's customers but in fact Cingular's customers. Kempner has not pointed to any evidence in the record which shows that Cingular contacted Kempner customers, defined as customers who were not subscribed to Cingular's cellular services, or that Cingular was prohibited in any way from contacting its own customers about upgrading their Cingular equipment or service. Additionally, there is no evidence that Cingular said anything dishonest or false to their customers. In the end, Kempner cannot distinguish Cingular's behavior to that of any other competitor in the cellular phone market.

In denying Cingular's motion for judgment as a matter of law, the district court improperly reviewed Cingular's

motion as a question of whether Kempner could legally state a claim for tortious interference in light of its claims for breach of contract. In addressing this subsidiary issue raised by Cingular's motion for judgment as a matter of law, the district court failed to analyze the underlying merits of Kempner's tortious interference claim to determine whether there was sufficient evidence to establish such a claim. Accordingly, judgment as a matter of law should have been entered in Cingular's favor on Kempner's tortious interference claim as there is simply no evidence in the record that Cingular was doing anything more than encouraging its own clients to upgrade equipment and/or to continue to use its cellular services.

## III.  CONCLUSION

For all the foregoing reasons, the district court's denial of Cingular's motion for judgment as a matter of law on Kempner's claim of tortious interference with prospective business is REVERSED, and judgment as a matter of law on Kempner's claim of tortious interference is GRANTED in favor of Cingular. The remaining rulings of the district court are AFFIRMED.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*